## STATE OF OREGON,
*Petitioner on Review,*

*v.*

## JOSEPH LUNA DELGADO,
*Respondent on Review.*

(CR83-946; CA A30962; SC S31059)

692 P2d 610

Robert W. Muir, Assistant Attorney General, Salem, argued the cause for petitioner on review. With him on the briefs were Dave Frohnmayer, Attorney General, James E. Mountain, Jr., Solicitor General, and Lynn Torno, Certified Law Student.

Susan M. Garrett, Salem, argued the cause and filed briefs for respondent on review.

Robert Dowlut, Washington, D.C., and Steven L. Krasik, Salem, filed a brief amicus curiae for National Rifle Association.

LENT, J.

**LENT, J.**

The issue is whether ORS 166.510(1), insofar as it prohibits the mere possession and mere carrying of a switch-blade knife, violates defendant's right to bear arms under Article I, section 27, of the Oregon Constitution. We hold that in that respect the statute does violate defendant's constitutional right.

ORS 166.510(1) provides, in relevant part:

"* * * *[A]ny person who* manufactures, causes to be manufactured, sells, keeps for sale, offers, gives, loans, *carries or possesses an instrument or weapon having a blade which projects or swings into position by force of a spring or other device and commonly known as a switch-blade knife* or an instrument or weapon commonly known as a blackjack, slung shot, sandclub, sandbag, sap glove or metal knuckles, or who carries a dirk, dagger or stiletto commits a Class A misdemeanor." (Emphasis added)

Article I, section 27, of the Oregon Constitution provides:

"The people shall have the right to bear arms for the defence of themselves, and the State * * * [.]"

The accusatory instrument charged that defendant "did unlawfully possess and carry" a weapon commonly known as a switch-blade knife in violation of ORS 166.510. Defendant demurred to the accusatory instrument on the ground that the statute was overbroad as impinging on the right guaranteed to him under Article I, section 27, of the Oregon Constitution. The trial court overruled the demurrer.[1]

Trial then proceeded on the basis of facts stipulated to be the same as those found by the trial court in the hearing on the motion to suppress mentioned in footnote 1, *supra.* Those facts are as follows.

On October 3, 1983, defendant was walking with a companion on a public street. The two appeared disorderly to an officer nearby, and when defendant reached up as he passed a street sign and tapped or struck it with his hand, the

---

[1] The defendant had also filed a motion to suppress the knife as evidence on the basis that it was obtained as a result of an unlawful search and seizure. The trial court's denial of that motion was not assigned as error.

officer confronted both individuals and conducted a patdown search. Defendant was found with a switch-blade knife in his back pocket. Defendant told the arresting officer that he carried the knife "for protection" (defendant evidently feared attack by a jealous rival for his present girl friend).[2]

Defendant moved for judgment of acquittal, which was denied. The trial court then found defendant guilty and eventually sentenced defendant to jail "suspended on the condition" that defendant meet certain terms of probation.

Defendant appealed, assigning as error the trial court's overruling of his demurrer and denial of his motion for judgment of acquittal. The Court of Appeals, per curiam, reversed on the basis of our decisions in *State v. Blocker,* 291 Or 255, 630 P2d 824 (1981), and *State v. Kessler,* 289 Or 359, 614 P2d 94 (1980). We allowed review to determine whether a switch-blade knife is within the constitutional guarantee. 298 Or 37 (1984).

In *State v. Kessler, supra,* this court for the first time considered the scope of Article I, section 27. There, following the discovery by police officers of two billy clubs in his apartment, defendant was charged with the possession of billy clubs in violation of ORS 166.510(1), the same statute at issue in the case at bar. On appeal defendant argued that the statute violated Article I, section 27, of the Oregon Constitution. The Court of Appeals held that ORS 166.510(1) was within the reasonable exercise of what the court called the state's "police power" to control crime. 43 Or App 303, 307, 602 P2d 1096, 1097 (1979). We reversed.

In *Kessler,* we examined the historical roots of Article I, section 27. We concluded that the drafters of Oregon's constitution did not wish to limit the right to bear arms to a citizen militia, but rather intended that the private citizen

---

[2] We have in mind that defendant's principal argument is that, insofar as this charge of criminal conduct is concerned, the statute is overbroad in proscribing conduct in which he has a state constitutional right to engage. Ordinarily, we would have no reason to go beyond the facts described in the accusatory instrument to resolve whether error was committed in overruling defendant's demurrer. In this case, however, a factual record was developed, and the defendant also assigned as error the denial of his motion for judgment of acquittal. The facts are recounted to show that there is no evidence to support any possible charge of an illegal intent to use the weapon or an illegal use of the weapon.

also have the right to "possess certain arms for the defense of person and property." 289 Or at 371, 614 P2d at 98.

Our analysis in *Kessler* of the meaning of the term "arms" is central to the case at bar and so merits a further discussion. We reasoned that because settlers during the revolutionary era used many of the same weapons for both personal and military defense, the term "arms," as contemplated by the constitutional framers, was not limited to firearms but included those hand-carried weapons commonly used for personal defense. 289 Or at 368, 614 P2d at 98. Thus, the term "arms" "includes weapons commonly used for either purpose, even if a particular weapon is unlikely to be used as a militia weapon." 289 Or at 369, 614 P2d at 98. On the basis of this historical examination, we held that the possession of a billy club was constitutionally protected:

> "Our historical analysis of Article I, section 27, indicates that the drafters intended 'arms' to include the hand-carried weapons commonly used by individuals for personal defense. The club is an effective, hand-carried weapon which cannot logically be excluded from this term."

289 Or at 372, 614 P2d at 100.[3]

The state argues that a switch-blade is not a weapon "commonly used for personal defense," and is therefore not an "arm" within the meaning of the Oregon Constitution. It insists that the switch-blade is an offensive weapon used primarily by criminals. In support of this argument we are referred to various authorities, especially the Federal Anti-Switchblade Act, 15 USC §§ 1241-44 (Supp IV, 1980), which is aimed at prohibiting the introduction of switch-blade knives into interstate commerce because they are "almost exclusively the weapon of the thug and the delinquent." S. Rep. No. 1980, 85th Cong., 2d Sess., reprinted in 1958 U.S. Code Cong & Ad News 3435, 3437.

We note, first, that that material offers no more than impressionistic observations on the criminal use of switch-blades. More importantly, however, we are unpersuaded by this distinction which the state urges of "offensive" and

---

[3] One year later, in *State v. Blocker,* 291 Or 255, 259, 630 P2d 824, 826 (1981), we held that the possession of a billy club outside as well as inside the home is constitutionally protected.

"defensive" weapons. All hand-held weapons necessarily share both characteristics. A kitchen knife can as easily be raised in attack as in defense. The spring mechanism does not, instantly and irrevocably, convert the jackknife into an "offensive" weapon.[4] Similarly, the clasp feature of the common jackknife does not mean that it is incapable of aggressive and violent purposes. It is not the design of the knife but the use to which it is put that determines its "offensive" or "defensive" character.

There are statutes now on the books that concern the manner in which weapons are carried, the intent with which they are carried, the use to which they may not be put and the status of a person that results in forbidding his possessing a weapon.

> "This state has several such regulatory statutes, with which we are not concerned in this case: ORS 166.220(1) prohibiting possession of a dangerous weapon with intent to use such weapon unlawfully against another; ORS 166.240, prohibiting carrying certain weapons concealed about one's person; ORS 166.250, prohibiting carrying any firearm concealed upon the person or within any vehicle without a license to do so." (Footnote omitted.)

*State v. Blocker, supra,* 291 Or at 259-260, 630 P2d at 826. *See, also,* ORS 166.270, which prohibits an exconvict from possessing a firearm concealable on the person, which this court held not to offend Article I, section 27, of the Oregon Constitution in *State v. Robinson,* 217 Or 612, 619, 343 P2d 886 (1959).

The appropriate inquiry in the case at bar is whether a kind of weapon, as modified by its modern design and function, is of the sort commonly used by individuals for personal defense during either the revolutionary and post-revolutionary era,[5] or in 1859 when Oregon's constitution was

---

[4] At one time the single-action, single-shot handgun was carried by many men for defense. Did the development of the double-action feature of the handgun or the addition of the revolving cylinder which enabled one to fire the gun several times without pausing to reload, as a matter of law, transform the handgun from a defensive weapon to an offensive weapon? Obviously, the gun, both before and after such changes, could be used for either defense or offense.

[5] Article I, section 27, of the Oregon Constitution was taken verbatim from sections 32 and 33 of the Indiana Constitution of 1851. Indiana's bill of rights liberally drew upon the state constitutions of Kentucky, Ohio, Tennessee, and Pennsylvania, which were drafted between 1776 and 1802. *See State v. Kessler,* 289 Or 359, 365, 614 P2d 94, 95 (1980).

adopted. In particular, it must be determined whether the drafters would have intended the word "arms" to include the switch-blade knife as a weapon commonly used by individuals for self defense. To answer that question we must journey briefly into the history of knives. We have resorted primarily to three books by H. Peterson for that history: Arms and Armour in Colonial America, 1526-1783 (1956); American Knives (1958); Daggers and Fighting Knives of the Western World (1968). What we have to say generally in the next few paragraphs is drawn from those works.

The popularity of the fighting knife has had an uneven history, even to today. During the Roman civilization and for several centuries thereafter, for example, the knife was little appreciated as a tool of combat, but during the Viking Period of the 9th and 10th centuries large knives (scramasax), used for general purposes as well as for war, were popular among the Northmen, Germans, Franks and Anglo-Saxons. It was during the Middle Ages that the real flowering of the fighting knife and dagger occurred. New shapes appeared and the knife became part of the standard dress for all classes: from the knights and their men-at-arms as an adjunct to the sword, to the laborer and peasant for protection and convenience. During the 16th century the dagger came to be used by the aristocracy, mainly in conjunction with the sword, and was used primarily for combat; indeed, during the early part of that century the technique of fighting with sword and dagger developed, thus giving rise to the modern school of knife fighting. Through the 16th and 17th centuries knives and daggers declined in importance and were no longer an important part of the daily civilian costume.

In early colonial America the sword and dagger were the most commonly used edged weapons. During the American colonial era every colonist had a knife. As long as a man was required to defend his life, to obtain or produce his own food or to fashion articles from raw materials, a knife was a constant necessity. Around 1650 one form of dagger popular in the colonies was the "plug bayonet," so called because it fit into the muzzle of a musket. It was used both as a dagger or as a general utility knife. Other knives became popular during the 17th and 18th centuries. The American frontiersman used a large knife to ward off danger from Indian attacks and to

hunt and trap; along with that he carried a smaller knife, the blade being three to four inches long, in his rifle bag.

In the 19th century, daggers remained popular, but in the west the renowned Bowie knife became the weapon favored by the lawless and law-abiding alike. These were violent times, particularly from the 1820s through the Civil War, when a weapon might be needed at a moment's notice. In response, "the well-equipped gentleman carried a pistol in his pocket and a knife beneath his coattails."

Of the many varieties of knives, none has been a more constant or enduring companion to man than the pocket knife. Specimens of folding pocket knives have been discovered in Roman archeological sites, indicating that such knives were popular at least from the first century A.D. They have been manufactured for their utility as both instruments of labor and combat. One of the most common of the specific named knives is the jackknife, a word of uncertain origin, which was a large single-bladed folding knife, ranging in size from four to seven inches when closed. By the early 1700s, when the eastern seaboard had become a highly settled area with large towns and cities and relatively good roads, men normally carried a folding pocket knife. Even when they joined the American army during the revolution, the knife they carried was the jackknife, which was mentioned frequently in colonial records. During the American Revolution at least two states, New Hampshire and New York, required their militiamen to carry a jackknife. Even during the mid-18th century, some of these "jackknives" were rather more lethal than their name suggests, measuring two feet long with the blade extended, and designed solely for fighting. G. Neumann, Swords and Blades of the American Revolution 247 (1973). Some others had blades over 16 inches long, extending well beyond the hilt even when folded, and were designed to be used open or closed. "Gentlemen" and officers during this same era often carried canes with slender daggers mounted inside which could be drawn with a quick tug and were used for personal defense. Neumann, Swords and Blades of the American Revolution, *supra,* at 239. In the early 19th century a special form of dagger also developed, the pocket or folding dagger, with blades ranging in size from four to sixteen inches; they were intended to be carried in the pocket or in special sheathes.

It is clear, then, that knives have played an important role in American life, both as tools and as weapons. The folding pocketknife, in particular, since the early 18th century has been commonly carried by men in America and used primarily for work, but also for fighting.

This brings us to the switch-blade knife. A switch-blade is defined as a "pocketknife having the blade spring-operated so that pressure on a release catch causes it to fly open." Webster's Third International Dictionary 2314 (1971). If ORS 166.510(1) proscribed the possession of mere pocketknives, there can be no question but that the statute would be held to conflict directly with Article I, section 27. The only difference is the presence of the spring-operated mechanism that opens the knife. We are unconvinced by the state's argument that the switch-blade is so "substantially different from its historical antecedent" (the jackknife) that it could not have been within the contemplation of the constitutional drafters. They must have been aware that technological changes were occurring in weaponry as in tools generally. The format and efficiency of weaponry was proceeding apace. This was the period of development of the Gatling gun, breach loading rifles, metallic cartridges and repeating rifles. The addition of a spring to open the blade of a jackknife is hardly a more astonishing innovation than those just mentioned.[6]

We stress again, as we have stressed before, that this decision does not mean individuals have an unfettered right to possess or use constitutionally protected arms in any way they please. The legislature may, if it chooses to do so, regulate possession and use. *See State v. Blocker, supra,* 291 Or at 259, 630 P2d at 826; *State v. Kessler, supra,* 289 Or at 370, 614 P2d at 100. This court recognizes the seriousness with which the legislature views the possession of certain weapons, especially switch-blades.[7] The problem here is that ORS 166.510(1)

---

[6] Charles Dickens, in his novel Martin Chuzzlewit, published in 1842 shortly after his return from America, referred to a certain Scadder, who "picked his teeth with a sort of young bayonet that flew out of his knife when he touched a spring." This suggests that America could have been the origin of the switch-blade. *See* A. Popkess, *Flick Knives,* [1959] Crim L R 640.

[7] ORS 166.510(1) was amended in 1957 to include, for the first time, proscription against the possession of switch-blades. Or Laws 1957, ch 290, § 1.

absolutely proscribes the mere possession or carrying of such arms. This the constitution does not permit.[8]

The decision of the Court of Appeals is affirmed.

---

[8] The analysis we have employed in *State v. Kessler* and *State v. Blocker, supra,* at footnotes 3 and 5, concerning clubs and in the case at bar concerning a knife may not be the same analysis that would be appropriate to the application of Article I, section 27, of the Oregon Constitution to a weapon such as a can of mace, not having a pre-twentieth century form or counterpart. It has been suggested that it is incongruous to believe that a woman today to defend herself from a rapist would have constitutional sanction for carrying a switch-blade knife but not for the can of mace because the latter was unknown to the mid-nineteenth century. Such a case is not before us. The time to deal with that case is when it is presented.