ANSTEAD, Justice,
specially concurring.
While I agree with the majority that L.B.’s knife is a “common pocketknife” as a matter of law, I write separately to express my belief that the statute at issue here is, contrary to the majority’s analysis, unconstitutionally vague in its use of the word “common.”
As noted by the majority, the general test to determine whether a statute is vague is whether the statute “does not give people of ordinary intelligence fair notice of what constitutes forbidden conduct.” Muller, 693 So.2d at 977. Most “persons of ordinary intelligence” presumably know what a “pock- • etknife” is. Yet the modifier “common” makes this otherwise clear concept nebulous and vague. Pocketknives are manufactured in an almost infinite variety of sizes and styles.[5] Determining which knives are “com *374 mon” cannot be done in a rational and consistent manner. The Fifth District has determined, for example, that “[n]ot all knives that fold are ‘common pocketknives’ and not all knives that fit into a pocket are ‘common pocketknives.’ ” Mims v. State, 662 So.2d 962, 963 (Fla. 5th DCA 1995).
In 1951, the Attorney General of Florida opined that a folding knife with a blade of four inches in length or less is a “common poeketknife.” Op. Att’y Gen. Fla. 051-358 (1951). In comparison, the trial court in the instant case ruled that L.B.’s knife, which had a 3 3/4 inch blade, was not a “common” poeketknife. Thus, it seems apparent in reality that “persons of ordinary intelligence”, i.e., the Attorney General in 1951, and the trial judge here, may, indeed, differ as to what constitutes a “common” poeketknife. Moreover, since pocketknives with blade-lengths in excess of four inches are not uncommon (in that numerous such knives exist), the uncertainty does not lie exclusively in the “marginal” or “peripheral” cases referred to by the majority. Not only is there a difficulty in determining whether a particular knife is “common” as to its blade-length, but there doubtless exist smaller pocketknives that the Legislature did not intend to prohibit the possession of, yet could be considered “uncommon” in light of unique features such as gold inlays or titanium blades. Clearly then, it may not always be evident to “persons of ordinary intelligence” whether one’s particular knife is a “common” poeketknife.
While the majority is correct in stating that “all doubts as to the validity of a statute are to be resolved in favor of constitutionality where reasonably possible,” Department of Law Enforcement v. Real Property, 588 So.2d 957, 961 (Fla.1991), we also have held that “when there is doubt about a statute in a vagueness challenge, the doubt should be resolved in favor of the citizen and against the state.” Brown v. State, 629 So.2d 841, 843 (Fla.1994).[6] For that reason, and because the statute “delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis” in all cases, and not just those that can be characterized as “marginal,” see Bouters v. State, 659 So.2d 235, 238 (Fla.1995), I would hold that section 790.001(13) is unconstitutionally vague.
REMEDY
By excising the term “common pocketknife” from section 790.001(13), the Second District created a situation where citizens and fact-finders were left in the position of determining whether a particular poeketknife is a “deadly weapon” under the statute, rather than determining whether it is a “common poeketknife.” In effect, the Second District removed, in an ex post facto manner, a statutory exception to a criminal statute that clearly advised our citizens that it was legal to possess a poeketknife. The courts cannot lightly excise such an exception, thereby subjecting our citizens to criminal prosecution for conduct that the legislature clearly intended to be protected. This cannot be an appropriate remedy where all agree the legislature has expressly excepted “common pocketknives” from the definition of “weapon.” Moreover, since “the precision required of statutes must come from the Legislature,” Brown, 629 So.2d at 843,[7] the fashioning of a “bright line legal test” to determine whether a particular poeketknife is “common” should also be left to the Legislature.
*375 We can learn from other state courts that have considered this issue. For example, the Oregon Supreme Court, in considering the meaning of an “ordinary poeketknife,” has observed that:
Of the many varieties of knives, none has been a more constant or enduring companion to man than the pocket knife. Specimens of folding pocket knives have been discovered in Roman archeological sites, indicating that such knives were popular at least from the first century A.D. They have been manufactured for their utility as both instruments of labor and combat....
It is clear, then, that knives have played an important role in American life, both as tools and as weapons. The folding pocketknife, in particular, since the early 18th century has been commonly carried by men in America and used primarily for work, but also for fighting.
State v. Delgado, 298 Or. 395, 692 P.2d 610, 613 (1984). In another Oregon case, the Court of Appeals recognized that:
There are many types of poeketknives, with varying combinations of blades and sizes, handle styles and other features, designed for various uses and users. Some poeketknife features might have been designed primarily to make the knife more lethal when used against another person, but other features which would make one knife potentially more dangerous than another (such as the locking blade and the blade length of the knife involved here) are designed to make it useful for lawful purposes and possibly safer. The legislature is capable of clearly stating the scope of a prohibition against knives whose design creates unreasonable chances of unlawful use.
... A poeketknife which may be considered “ordinary” in one set of circumstances may be considered highly unusual or uncommon in other circumstances. [n.5]
[[Image here]]
Cn.5) At some risk in the face of the statute [excluding the carrying of "ordinary pocketknives” from criminal prosecution], the author of this opinion carries with him in a pocket during every waking hour a device known as a "Swiss Army knife.” It has two cutting blades, two screwdrivers, a can opener, a bottle opener, a wire stripper, scissors, an awl, a file, a Phillips screwdriver, tweezers, a toothpick (of imitation ivory!) and a 2 'A inch long saw which can cut through a small tree limb in short order. It is seldom used as a knife. Ordinary? Illegal? Who knows?
State v. Pruett, 37 Or.App. 183, 586 P.2d 800, 802-03 (1978) (footnote omitted).
I believe the appropriate remedy to be that fashioned by the Court of Appeals of Oregon in State v. Harris, 40 Or.App. 317, 594 P.2d 1318 (1979). The court in Harris excised the term “ordinary” from a statute excluding from prosecution the possession of an “ordinary poeketknife” and left “pocketknife” as an exception. Id. at 1320.[8] As noted by the court in Harris:
Everybody can recognize and immediately name a knife with a folding blade that fits in a pocket a “poeketknife” and until a defendant arrives with a folding machete and a long pocket, the term is not likely to be a primary cause of concern.
594 P.2d at 1320. To be sure, “poeketknife” is a fairly clear concept that can be looked up in a dictionary.[9] The term is essentially taken to mean any knife that folds into its handle and that can easily be carried in one’s pocket.
This Court has the authority and obligation to devise an appropriate and just remedy,[10] especially under the circumstances *376 presented here, where the Legislature clearly intended that “pocketknives” be excepted from the definition of weapon. For that reason, I would follow the reasoning of the Oregon Court of Appeals in Harris and hold that section 790.001(13) should be read as excepting “pocketknives” from the definition of “weapon,” rather than “common pocketknives,” and remand the ease with directions that the petitioner be ordered to be discharged.
KOGAN, C.J., concurs.

. The single company Victorinox manufactures the following versions of its "Swiss Army” knife: "The Classic,” "Classic with Pen," "Classic with Rosewood Handle," "Sterling Silver Classic,” “Classic Star of David,” "Vintage,” "Swiss Champ,” “Mini Champ,” "Tinker,” “Super Tinker,” "Deluxe Tinker,", “Camouflage Tinker,” “Outward Bound Tinker," “Climber,” "Deluxe Climber,” "Camper,” "Explorer,” "Picnicker,” “Hunter,” “Huntsman,” "Adventurer,” "Hiker,” "Fisherman,” "Pioneer,” "Fieldmaster,” "Rucksack,” "Ranger,” "Soldier,” "Spartan,” "Re *374 cruit," "Pocket Pal,” "Golfer,” "Caddy,” "Equestrian,” “Waiter,” "Craftsman,” "Mechanic,” "Electrician,” "Time Keeper,” "Super Timer," "Traveler's Set,” "Money Clip Knife,” "Ambassador,” "Executive,” and six versions with the Boy Scout logo. Most are manufactured with a choice of colors. The Knife Center of the Internet, The Knife Center Presents Victorinox (visited July 9, 1997) <http://www.knifecen-ter.com/knifecenter/sak/sakl.htmI$.

. In Brown, we held that the term “public housing facility” was unconstitutionally vague. 629 So.2d at 843. We reasoned that it was impossible to know what the Legislature intended to target by that term. Id. Like the term "common poeketknife” here; there are doubtless some circumstances in which it would be obvious that one is standing in a "public housing facility,” yet we still held that the term was unconstitutionally vague.

. Such precision could have been established by the Legislature in this case, such as by drafting the statute to exclude from the definition of "weapon” any poeketknife with a blade-length of less than an objective and measurable length.

. The district court below declined to employ that option, instead reasoning that the term ''poeketknife” alone is still too vague in light of the Legislature's failure to define that term. L.B., 681 So.2d at 1181 n. 3.

. The term "poeketknife” is clear in the generally understood meaning of the term. However, as noted earlier, the poeketknife is constructed in many varieties and sizes, making it difficult or impossible to know whether some poeketknives are "common.”

.We have long recognized the general rule that "[a]n unconstitutional portion of a general law may be deleted and the remainder allowed to stand if the unconstitutional provision can be logically separated from the remaining valid provisions, that is, if the legislative purpose expressed in the valid provisions can be accomplished independently of those which are void, and the good and bad features are not inseparable and the Legislature would have passed one without the other; and an act complete in itself remains after the invalid provisions are strick *376 en.” Moreau v. Lewis, 648 So.2d 124, 128 (Fla. 1995) (quoting Presbyterian Homes v. Wood, 297 So.2d 556, 559 (Fla.1974)).