LANDAU, J.,
concurring.
I agree with the majority’s disposition and reasoning on the merits in this case. I write separately to address the state’s argument that we should reexamine the search and seizure guarantee of Article I, section 9, in accordance with this court’s “usual paradigm” for constitutional interpretation. The majority summarily rejects the state’s argument. State v. Hemenway, 353 Or 129, 137-38, 295 P3d 617 (2013). I agree with the majority’s ultimate conclusion, but I think that it is important to set out some of the reasons why that conclusion is correct.
The state’s argument is predicated on Stranahan v. Fred Meyer, Inc., 331 Or 38, 11 P3d 228 (2000), in which this court observed that “it long has been the practice of this court to ascertain and give effect to the intent of the framers” of a disputed provision of the state constitution. Id. at 54 (internal quotation marks omitted). The court invited litigants to present arguments that we should reconsider prior case law because of a “failure on the part of this court at the time of the earlier decision to follow its usual paradigm for considering and construing the meaning of the provision in question.” Id. In light of what this court said in Stranahan, I do not fault the state for making the argument that it advances in this case. I do, however, take issue with *155 Stranahan and its stated commitment to a jurisprudence of original intent.
At the outset, I question the accuracy of Stranahan’s observation that such has been the longstanding practice of the court. If the court meant that there are some very old cases in which the court applied that interpretive approach, I suppose the observation is true enough.[1] But I take Stranahan to assert that originalism[2] is a well-established methodology that this court has consistently applied for a long time. In that regard, Stranahan is incorrect. Sometimes the court has applied that interpretive approach, and sometimes it has not. See, e.g., Dodd v. Hood River County, 317 Or 172, 180-82, 855 P2d 608 (1993) (state constitutional takings clause interpreted without reference to framers’ intentions); State v. Mai, 294 Or 269, 272, 656 P2d 315 (1982) (state constitutional compulsory process clause is construed “in the same way as the [United States] Supreme Court construed the virtually identical federal counterpart” and without reference to the intention of its Oregon framers).
That said, there certainly are a number of cases in which the court determined the meaning of the state constitution by reference to the “framers’ intentions.” In fact, in more than a few cases, the court has effectively limited the scope and meaning of a provision of the state constitution to whatever its framers would have understood it to mean in 1857. At the very least, there is language in a number of those opinions that has understandably led parties — such as the state in this case — to argue that our state’s constitution means no more than what it meant to its framers at the time of its adoption.
*156 In Lakin v. Senco Products, Inc., 329 Or 62, 72, 987 P2d 463 (1999), for instance, this court sweepingly declared of the right to a jury trial guaranteed in Article I, section 17, that “whatever the right to ‘Trial by Jury’ meant in 1857, it means precisely the same thing today.” In Smothers v. Gresham Transfer, Inc., 332 Or 83, 118, 23 P3d 333 (2001), to pick another example, the court announced that the purpose of the remedy clause of Article I, section 10, “is to protect absolute common-law rights respecting person, property, and reputation, as those rights existed when the Oregon Constitution was drafted in 1857.” And in State v. Delgado, 298 Or 395, 401, 692 P2d 610 (1984), to pick still another, the court held that the question whether the state constitutional right to bear arms applies to the possession of a switch-blade knife depends on “whether the drafters would have intended the word ‘arms’ to include the switch-blade knife [.]”
In my view, the idea that the original state constitution means no more than what it meant to its framers in 1857 is untenable. To begin with, all too often, the state of the historical record is such that we simply cannot know what the framers had in mind.[3] We do not even know with any certainty that the framers intended that their intentions or understandings should count in future constitutional interpretation.[4] But even when the historical record does permit *157 some inferences and conclusions about the original intentions and understandings of the framers, the idea that those intentions and understandings are controlling makes the state’s highest law little more than a historical artifact of an era that few in this century actually would choose as a determinant of individual rights and government authority — an era, it should be remembered, when women possessed few political and civil rights, when the common law recognized no protections for workers, and when the people decreed that a “negro” or “mulatto” who did not already reside in the state when the constitution was adopted was not permitted to reside in Oregon. Or Const, Art I, § 35, repealed 1926.
That is not to say that the historical context for the adoption of a constitutional provision is irrelevant. All provisions of a state constitution were adopted at a specific point in history. That history — including the intentions or understandings of the framers (or perhaps more precisely, the voters)[5] — is always relevant. State constitutions, after all, are commands designed to instruct citizens and government officials about the powers of government and the limitations on the exercise of those powers. As such, those commands invite consideration of their intended purposes.[6]
A number of constitutional provisions are of relatively recent vintage, adopted with comprehensive records as to the intentions or understandings of their makers, and prepared with the obvious expectation that those records be taken into account in determining the meaning of the provisions. In such cases, it makes much sense to heed carefully the available evidence of their intended purposes.[7]
*158 But much of the original constitution consists of vaguely worded clauses adopted a century and a half in the past, with little or no record of their meanings or purposes. In such cases, it is difficult to speak with any precision about the intentions of the framers. Moreover, whatever we do know of the specific intentions of the framers of the Oregon Constitution is difficult to apply to modern circumstances that were hardly in the contemplation of persons who lived in the middle of the nineteenth century. At best, the historical record will offer, in very general terms, an idea of some underlying principles that may have animated the original provisions, which principles may be applied to modern circumstances.[8]
The search and seizure clause of Article I, section 9, that is at issue in this appeal is an excellent case in point. The clause requires that searches and seizures not be “unreasonable.” Beyond the fact that the provision was obviously based on the Fourth Amendment, there is a complete absence of direct historical evidence of what the framers intended or what the voters understood about the provision. It was adopted without discussion in the constitutional convention, and there is no record of public debate about it during ratification. See generally Claudia Burton & Andrew Grade, A Legislative History of the Oregon Constitution of 1857 — Part I (Articles I & II), 37 Willamette L Rev 469, 515 (2001) (search and seizure provisions were passed with “no reported comment or debate”). Any attempt to reconstruct what the framers or voters might have intended in adopting Article I, section 9, will yield only speculation. There is no real consensus among historians about what people thought about search and seizure guarantees in the late-eighteenth century. There is an especially fierce debate among scholars about the original understanding of the Fourth Amendment.[9] There is perhaps slightly less controversy about the *159 general understanding of state search and seizure clauses in the early- to mid-nineteenth century; it appears that most courts at that time interpreted them merely to require that searches and seizures be “reasonable” under the circumstances in which the actions occurred.[10]
A particularly significant problem with trying to apply Article I, section 9, as it would have been understood back in 1857 is the fact that its very wording invites analysis that is not historically bound. The requirement that searches and seizures be “reasonable” seems to me to necessitate constant reassessment in light of changing circumstances. Trying to determine what is reasonable today by looking solely to nineteenth-century history seems to me akin to trying to drive a vehicle on an interstate highway by looking only in the rearview mirror.
In short, the majority is correct in rejecting the state’s contention that we should interpret the search and seizure clause of Article I, section 9, to reflect only the intentions or understandings of its framers in 1857. My point in writing separately is to explain my view that there are important underlying reasons why we should not interpret the search and seizure clause that way — reasons that *160 counsel the exercise of caution and skepticism in assessing the significance of such nineteenth-century intentions and understandings as we interpret other provisions of the original constitution, as well.

 The court in Stranahan cited Jones v. Hoss, 132 Or 175, 178, 285 P 205 (1930). There are actually older cases, such as Noland v. Costello, 2 Or 57, 58-59 (1863), that refer to the intentions of the framers of the state constitution.

 I use the term somewhat loosely to refer to the mode of constitutional interpretation that regards the meaning of a provision as frozen in time in accordance with the intentions of those who adopted the constitution or with the meaning of the constitution as it would have been understood at that time. I understand that, among scholars, there is a difference between original intent and original public meaning, see, e.g., Keith E. Whittington, The New Originalism, 2 Geo J L & Pub Pol’y 599 (2004) (describing transition among originalist scholars from emphasizing original intent to original public meaning), but that is a distinction that this court’s prior cases have not consistently recognized.

 When faced with such circumstances, this court in some cases has attributed to the framers of the Oregon Constitution knowledge of information that there is no evidence they actually possessed. See, e.g., State v. Cookman, 324 Or 19, 28-31, 920 P2d 1086 (1996) (attributing to the framers of the Oregon Constitution an intention to follow an 1822 Indiana Supreme Court decision interpreting the 1816 version of the Indiana Constitution that was the predecessor to the 1851 Indiana Constitution that is presumed to be the basis for Oregon’s ex post facto clause, because the decision was, at least in a temporal sense, “available” to the Oregon framers). The effect is to reconstruct a presumed intention that we have no way of knowing accords with reality.

 That the delegates to the Oregon Constitutional Convention expressly declined to create any official record of their debates would seem to suggest that they did not care one way or the other. One of the arguments in favor of keeping a record of the convention was precisely to preserve a record of the intentions of the framers for future reference. Charles H. Carey ed., The Oregon Constitution and Proceedings and Debates of the Constitutional Convention of1857 140 (1926). But the argument failed to carry the day. Moreover, any suggestion that the prevailing interpretive conventions of the day presumed that the intentions or understandings of the framers would control is at least debatable. See, e.g., John P. Figura, Against the Creation Myth of Textualism: Theories of Constitutional Interpretation in the Nineteenth Century, 80 Miss LJ 587 (2010) (summarizing various interpretive approaches reflected in nineteenth-century treatises).

 It is common to refer to the intentions of the “framers,” but, given that the constitution derives its force from ratification by the people, it is actually the voters, not the framers in the constitutional convention, whose intentions or understandings count. See Monaghan v. School District No. 1, 211 Or 360, 367, 315 P2d 797 (1957) (“The constitution derives its force and effect from the people who ratified it and not from the proceedings of the convention where it was framed!.]”).

 Thus, Priest v. Pearce, 314 Or 411, 415-16, 840 P2d 65 (1992), appropriately requires an examination of “the historical circumstances” that led to the adoption of a provision of the original constitution. Priest, however, does not require, as some of this court’s later cases have suggested, that those historical circumstances determine the meaning of the provision at issue.

 Accordingly, the approach to constitutional interpretation of amendments adopted by initiative set out in Ecumenical Ministries v. Oregon State Lottery Comm., 318 Or 551, 559-60, 871 P2d 106 (1994), with its focus on ascertaining the intentions of the people who adopted the amendments, seems correct to me.

 Some of this court’s more recent cases properly reflect that interpretive approach. See, e.g., State v. Davis, 350 Or 440, 446, 256 P3d 1075 (2011) (“[The purpose of historical analysis] is not to freeze the meaning of the state constitution in the mid-nineteenth century. Rather it is to identify, in light of the meaning understood by the framers, relevant underlying principles that may inform our application of the constitutional text to modern circumstances.”)

 The crux of the debate concerns whether the framers of the Fourth Amendment understood or intended that searches and seizures generally require warrants. Strictly speaking, the Fourth Amendment says only that searches and seizures be reasonable and that warrants should not issue except on probable cause. Some *159 scholars, however, argue that the framers understood the amendment implicitly to require warrants. See, e.g., William J. Cuddihy, The Fourth Amendment: Origins and Original Meaning 1602-1791 (2009). Others argue that the Fourth Amendment merely requires that searches and seizures not he unreasonable. See, e.g., Akhil Reed Amar, Fourth Amendment First Principles, 107 Harv L Rev 757 (1994). Still others contend that the “reasonableness clause” of the amendment was intended only as a preamble and that the sole purpose of operative provision was to limit the issuance of warrants. See, e.g., Thomas Y. Davies, Recovering the Original Fourth Amendment, 98 Mich L Rev 547 (1999). And yet others argue that the Fourth Amendment was originally intended only to regulate the issuance of warrants to search houses. See, e.g., David E. Steinberg, The Uses and Misuses of Fourth Amendment History, 10 U Pa J Const L 581 (2008).

 See, e.g., Rohan v. Sawin, 59 Mass 281, 284-85 (1850) (purpose of state and federal search and seizure guarantee was solely to require that warrants issue on sworn complaint establishing probable cause); Wakely v. Hart, 6 Binn 315, 318 (Pa 1814) (state constitution does not prohibit warrantless searches and requires only that warrants issue on probable cause); Mayo v. Wilson, 1 NH 53, 60 (1817) (state constitution “does not seem intended to restrain the legislature from authorizing arrests without warrant, but to guard against the abuse of warrants issued by magistrates”). In fact, as late as 1927, this court held that “the possession of [a] warrant is not the controlling consideration of whether a search is reasonable or unreasonable. An officer armed with a warrant may make an unreasonable search. An officer without a warrant may make a reasonable search.” State v. De Ford, 120 Or 444, 452, 250 P 220 (1927).