SUPREME JUDICIAL COURT 
 
 COMMONWEALTH vs. DAVID E. CANJURA

 
 Docket:
 SJC-13432
 
 
 Dates:
 December 4, 2023 - August 27, 2024
 
 
 Present:
 Budd, C.J., Gaziano, Kafker, Wendlandt, & Georges, JJ.
 
 
 County:
 Suffolk
 

 
 Keywords:
 Constitutional Law, Right to bear arms. Evidence, Knife. Practice, Criminal, Dismissal. Words, "Arms," "Common use," "Dangerous and unusual weapons."
 
 

             Complaint received and sworn to in the Central Division of the Boston Municipal Court Department on July 6, 2021.
            A motion to dismiss was heard by James M. Stanton, J., and a conditional plea was accepted by him.
            The Supreme Judicial Court granted an application for direct appellate review.
            Kaitlyn Gerber, Committee for Public Counsel Services, for the defendant.
            Elisabeth Martino, Assistant District Attorney, for the Commonwealth.
            The following submitted briefs for amici curiae:
            Andrea Joy Campbell, Attorney General, & Thomas E. Bocian, Assistant Attorney General, for the Attorney General.
            Daniel L. Schmutter, of New Jersey, & Jason A. Guida for Knife Rights, Inc., & another.
            Luke Ryan & Claudia Leis Bolgen for River Valley Taekwondo & another.
            GEORGES, J.  Since 1957, G. L. c. 269, § 10 (b) (§ 10 [b]), has prohibited people from possessing certain spring-release pocketknives, commonly known as "switchblades."  In this case, we are asked to decide whether § 10 (b)'s prohibition against carrying a switchblade knife violates the Second Amendment to the United States Constitution, considering the United States Supreme Court's decision in New York State Rifle & Pistol Ass'n v. Bruen, 597 U.S. 1 (2022) (Bruen).[1]  We conclude it does.  Accordingly, we reverse the denial of the defendant's motion to dismiss.
            Background.  We summarize the agreed-upon facts relevant to this appeal.  
            On July 3, 2020, Boston police officers responded to an altercation between a couple at Temple Place in Boston.  They found the defendant, David E. Canjura, standing in front of his girlfriend, seemingly preventing her from leaving.  The officers separated the couple and spoke with them individually.  The girlfriend reported the defendant had taken her phone and would not return it.  Two witnesses also reported seeing the defendant grab his girlfriend and push her against a wall.  
            The officers arrested the defendant and searched him incident to the arrest.  During the search, the officers recovered from his waist an orange firearm-shaped knife with a spring-assisted blade.  The defendant subsequently was charged with carrying a dangerous weapon, G. L. c. 269, § 10 (b), for the recovered knife, and assault and battery on a family or household member, G. L. c. 265, § 13M (a).  
            The defendant conceded the recovered knife met § 10 (b)'s definition of a "switch knife, or any knife having an automatic spring release device by which the blade is released from the handle."  Nevertheless, he challenged the constitutionality of § 10 (b) in a pretrial motion to dismiss.  The defendant argued that because a switchblade is an "arm," § 10 (b)'s prohibition on carrying a switchblade violated his Second Amendment right to bear arms for self-defense.  After a hearing, the judge denied the defendant's motion to dismiss.  The defendant then tendered an admission to sufficient facts for a finding of guilt on the § 10 (b) charge, while reserving his right to appeal from the denial of his motion to dismiss.  See Mass. R. Crim. P. 12 (b) (6), as appearing in 482 Mass. 1501 (2019).  The judge accepted the defendant's tender and entered a continuance without a finding for six months, placing the defendant on administrative probation.  The assault and battery on a family or household member charge was dismissed at the Commonwealth's request.  
            The defendant appealed, and we allowed his application for direct appellate review.  
            Discussion.  1.  Second Amendment analytical framework.[2]  The defendant contends § 10 (b) violates his Second Amendment right to keep and bear arms by criminalizing the carrying of a switchblade knife.[3]  The defendant's constitutional claim presents a question of law, which we review de novo.  See Commonwealth v. Feliz, 481 Mass. 689, 696 (2019), S.C., 486 Mass. 510 (2020).
            The Second Amendment provides:  "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  The Supreme Court has concluded the prefatory clause, "[a] well regulated Militia, being necessary to the security of a free State," does not mean the right of the people to keep and bear arms depends on service in the militia.  See Bruen, 597 U.S. at 20; District of Columbia v. Heller, 554 U.S. 570, 577, 592 (2008).  Rather, the "central component" of the Second Amendment is the "inherent right of self-defense," which "guarantee[s] to 'all Americans' the right to bear commonly used arms in public subject to certain reasonable, well-defined restrictions" (citation omitted).  Bruen, supra at 29, 70.  See Heller, supra at 581, 599, 628.  
            While both Heller and Bruen involved handguns, Second Amendment protections subsume more than just firearms.  See Caetano v. Massachusetts, 577 U.S. 411, 411-412 (2016) (per curiam) (stun guns constitute arms under Second Amendment).  Indeed, "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding."  Heller, 554 U.S. at 582. 
            Bruen requires that we employ a two-part test to determine whether a regulation or restriction passes constitutional muster under the Second Amendment.  First, we must determine whether "the Second Amendment's plain text covers an individual's conduct."  Bruen, 597 U.S. at 17.  If the regulated conduct falls outside the scope of the Second Amendment, our analysis ends.  If, on the other hand, we conclude the regulated conduct is covered by the plain text of the Second Amendment, "the Constitution presumptively protects that conduct," and we proceed to the second part of the analysis.  Id.  In the second part of the analysis, "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of [arms] regulation."[4]  Id. 
            Accordingly, applying the Bruen two-part analytical framework to this case, we first examine whether a switchblade is an "arm" under the plain text of the Second Amendment.  If so, we then analyze whether the Commonwealth has demonstrated § 10 (b)'s prohibition against carrying a switchblade is consistent with this nation's historical tradition of arms regulation.[5]  
            2.  Application.  a.  Step one.  The defendant argues a switchblade, at root, is a type of folding pocketknife, and law-abiding citizens have possessed folding pocketknives for lawful purposes since our nation's founding, including for self-defense.  Therefore, notwithstanding its spring-loaded opening mechanism, a switchblade is an "arm" under the Second Amendment.  The Commonwealth contends knives categorically are not protected by the Second Amendment because the definition of arms is limited to firearms.  The Commonwealth is incorrect -- as discussed above, the Second Amendment extends to all bearable arms and is not limited to firearms.  See Heller, 554 U.S. at 581-582.  
            In evaluating whether switchblades are "arms" entitled to Second Amendment protection, we are guided by the Supreme Court's decision in Heller.  There, the Supreme Court analyzed the plain meaning of the term "arms," observing its "[Eighteenth Century] meaning is no different from the meaning today."  Id. at 581.  The Heller Court provided two Eighteenth Century definitions of the term:  "[w]eapons of offence, or armour of defence," as defined in the 1773 edition of Samuel Johnson's dictionary, and "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another," as defined in Timothy Cunningham's 1771 legal dictionary.  Id.  The parties do not dispute switchblades fit these dictionary definitions of "arms"; like handguns, a person can carry a switchblade for offensive or defensive purposes in case of confrontation.  See id. at 628-629.   
            To assess whether the drafters would have intended the term "arms" to include switchblade knives for Second Amendment purposes, however, we must employ Heller's methodology, centered on constitutional text and history.  See Heller, 554 U.S. at 581-582.  A review of the history of the American colonies reveals that knives were ubiquitous among colonists, who used them to defend their lives, obtain or produce food, and fashion articles from raw materials.  See State v. Delgado, 298 Or. 395, 401 (1984).  See also G.C. Neumann, Swords and Blades of the American Revolution 227 (1973) (knives and daggers were "personal necessities to the early American").  
            In the colonial and Revolutionary War era, colonists typically owned or were equipped with hatchets, swords, and knives to use in their defense.  See State v. DeCiccio, 315 Conn. 79, 117 n.27 (2014).  Although swords and daggers were the most common bladed weapons, Seventeenth and Eighteenth Century Americans also carried smaller knives with three to four inch blades that were used for self-defense, hunting, and trapping.  See Delgado, 298 Or. at 401-402.  Of the many varieties of knives, the folding pocketknife played an important role, both as a tool and a weapon.  See id. at 403.  Indeed, as "America developed and its frontiers moved inland," the folding knife increased in popularity enough that it became an "almost universal" accessory.  Neumann, supra at 231.  "By the early 1700s, when the eastern seaboard had become a highly settled area with large towns and cities and relatively good roads, men normally carried a folding pocket knife."  Delgado, supra at 402.  
            Contemporaneous sources refer to Eighteenth Century folding pocketknives as "pocket knives," "folding knives," "spring knives," "clasp knives," or "jackknives."  See Neumann, supra at 231.  Most were single-bladed, with or without a holding spring, and had simple metal handles.  See id.  The term jackknife appears frequently in American colonial documents.  See H.L. Peterson, American Knives:  The First History and Collector's Guide 129 (1958).  Early jackknives were large, single-bladed knives, ranging from four to six and one-half inches in length when closed.  See id. at 130.  A particular type of jackknife known as a Barlow knife "is mentioned in American records at least as early as 1779 and seems to have been in general usage at that time."  Id.  
            In short, folding pocketknives not only fit within contemporaneous dictionary definitions of arms -- which would encompass a broader category of knives that today includes switchblades --- but they also were commonly possessed by law-abiding citizens for lawful purposes around the time of the founding.  Setting aside any question whether switchblades are in common use today for lawful purposes,[6] we conclude switchblades are "arms" for Second Amendment purposes.  Therefore, the carrying of switchblades is presumptively protected by the plain text of the Second Amendment.  We now turn to whether G. L. c. 269, § 10 (b), is consistent with this nation's historical tradition of arms regulation.  
            b.  Step two.  Again, even where a class of weapons constitutes bearable arms presumptively protected by the Second Amendment, the government may still justify its regulation by demonstrating the regulation is consistent with our nation's historical tradition.  See Bruen, 597 U.S. at 17.  At this second step of the analysis, Bruen requires us to determine whether "a challenged regulation addresses a general societal problem that has persisted since the [Eighteenth Century]."  Id. at 26.  If so, "the lack of distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment."  Id.  
            The Commonwealth may meet its burden by pointing to analogous regulations enacted close in time to the ratification of either the Second Amendment in 1791 or the Fourteenth Amendment in 1868.  See Bruen, 597 U.S. at 34.  Here, the Commonwealth attempts to meet its burden by pointing to three Nineteenth Century cases upholding statutory restrictions on certain types of knives, arguing these cases demonstrate a historical tradition of regulating certain knives.[7]  We are not convinced. 
            Although the appellate courts in the cited cases upheld State laws prohibiting the carrying of certain types of knives, none involved regulations of folding pocketknives, let alone switchblades.[8]  While it is true the Commonwealth is only required to "identify a well-established and representative historical analogue, not a historical twin," the most apt historical analogue of a modern-day switchblade is the folding pocketknife.  Bruen, 597 U.S. at 30.  See United States v. Rahimi, 144 S. Ct. 1889, 1898 (2024) ("A court must ascertain whether the new law is 'relevantly similar' to laws that our tradition is understood to permit, 'apply[ing] faithfully the balance struck by the founding generation to modern circumstances'" [citation omitted]).  Thus, these cases are inapposite because they involve historical regulations of categorically different types of bladed weapons.  Beyond these cases, the Commonwealth does not identify any laws regulating bladed weapons akin to folding pocketknives generally, or switchblades particularly, in place at the time of the founding or ratification of the Fourteenth Amendment.[9]  
            Accordingly, the Commonwealth has not met its burden of demonstrating a historical tradition justifying the regulation of switchblade knives under § 10 (b).  
            3.  Common use.  Notwithstanding the foregoing analysis, the Commonwealth contends that Second Amendment protection does not extend to modern switchblades because they are not in "common use" today for self-defense and are "dangerous and unusual" weapons primarily designed for stabbing others.  We disagree and discuss each of these contentions in turn.  
            The Bruen majority reiterated "the Second Amendment protects only the carrying of weapons that are . . . 'in common use at the time,'" as opposed to "dangerous and unusual weapons."  Bruen, 597 U.S. at 47, quoting Heller, 554 U.S. at 627.[10]  To determine whether a weapon is in "common use" today, most courts have chosen among three statistical approaches:  (1) raw numerical commonality, examining "the total number of a particular weapon"; (2) proportionate commonality, examining the proportion of a broader class of weapons that are the specific weapon in question, such as the percentage of firearms that are assault rifles; and (3) jurisdictional commonality, examining the number of States that allow the possession or carrying of the subject weapon.  Hollis v. Lynch, 827 F.3d 436, 449 (5th Cir. 2016).  "[T]here is considerable variety across the circuits as to what the relevant statistic is and what threshold is sufficient for a showing of common use."  Id.
            For purposes of this case, we conclude switchblades meet the "common use" test.  Today, only seven States and the District of Columbia categorically ban switchblades or other automatic knives, and only two States impose blade length restrictions of less than two inches.[11]  From these facts, we can reasonably infer that switchblades are weapons in common use today by law-abiding citizens for lawful purposes; more specifically, we can infer they are "widely owned and accepted as a legitimate means of self-defense across the country."  Caetano, 577 U.S. at 420 (Alito, J., concurring) (highlighting general acceptance of stun guns as legitimate means of self-defense).[12]   
            Turning next to the "dangerous and unusual" standard, many courts have treated the "common use" standard and the "dangerous and unusual" standard as two sides of the same coin.  See, e.g., United States v. Fincher, 538 F.3d 868, 874 (8th Cir. 2008), cert. denied, 555 U.S. 1174 (2009).  Other courts have drawn distinctions between these two standards.  For example, while the "common use" standard may focus on a statistical analysis of commonality, the "dangerous and unusual" standard may focus on the characteristics of the weapon itself.  See, e.g., National Ass'n for Gun Rights v. Lamont, 685 F. Supp. 3d 63, 90 (D. Conn. 2023) ("[a] 'dangerous and unusual' . . . firearm's character is such that it is . . . possessed . . . for the purpose of causing unlawful or excessive harm or fatalities"); Capen vs. Campbell, U.S. Dist. Ct., No. 22-11431-FDS, slip op. at 29 (D. Mass. Dec. 21, 2023) (same).[13]  Having considered the competing jurisprudence, we assume without deciding that the "dangerous and unusual" standard is distinct from the "common use" standard.  That said, we conclude switchblades are not "dangerous and unusual" weapons falling outside the protection of the Second Amendment.  
            In the most basic sense, all weapons are "dangerous" because they are designed for the purpose of bodily assault or defense.  See Caetano, 577 U.S. at 418 (Alito, J., concurring).  As such, general dangerousness of a weapon is irrelevant where the weapon belongs to a class of arms commonly used for self-defense.  See id.  Consequently, spring-loaded folding knives cannot be categorically prohibited just because they are, in everyday terms, "dangerous."  At the very least, for purposes of this analysis, "dangerous" weapons must feature uniquely dangerous qualities that are disproportionate to their use for self-defense.  See id. (noting if standard for "dangerous" subsumed all weapons designed to inflict death or bodily harm, virtually all weapons would qualify as "dangerous").  
            Nothing about the physical qualities of switchblades suggests they are uniquely dangerous.  "A switch-blade is defined as a 'pocketknife having the blade spring-operated so that pressure on a release catch causes it to fly open.'"  Delgado, 298 Or. at 403, quoting Webster's Third International Dictionary 2314 (1971).  In a closed position, the blade is restrained by a latch or lock; when the user presses a button, the latch is released, and the "blade automatically springs open and typically locks in the open position."  See Kopel, Cramer, & Olson, Knives and the Second Amendment, 47 U. Mich. J.L. Reform 167, 174 (2013).  The Commonwealth has not presented any evidence as to why a spring-operated mechanism that allows users to open switchblades with one hand makes switchblades uniquely dangerous when compared to a broader category of manual folding pocketknives.  Certainly, like handguns, switchblade knives are particularly suitable for self-defense because they are "readily accessible . . . cannot easily be redirected or wrestled away . . . [are] eas[y] to use . . . [and] can be [held] with one hand while the other hand" uses a phone to summon help.  Heller, 554 U.S. at 629.  
            4.  Remand.  As an alternative to ordering the dismissal of the dangerous weapon charge, the Commonwealth requests we remand this case to the trial court for further factual development in light of Bruen.  The Commonwealth argues this case could benefit from a more robust evidentiary record on whether and to what extent State and local governments regulated knives during the founding and Reconstruction eras.  We disagree.  
            The Commonwealth has not explained what further factual development necessitates this relief.  It is unclear what, if any, historical regulations can be unearthed should the Commonwealth be allowed additional time to develop the record.  Indeed, despite having the full benefit of Bruen throughout this appeal, the Commonwealth has failed to identify a single on-point historical analogue to G. L. c. 269, § 10 (b), from the time of the founding, or at least the time the Fourteenth Amendment was ratified.  We therefore decline to remand.  
            Conclusion.  We reverse the order denying the defendant's motion to dismiss.  The defendant's admission to sufficient facts on the § 10 (b) charge is vacated, and judgment shall enter for the defendant on that offense.[14]  
So ordered.  
 
footnotes

 
            [1] We acknowledge the amicus briefs submitted by River Valley Taekwondo and Massachusetts Association of Criminal Defense Lawyers in support of the defendant; Knife Rights, Inc., and the Knife Rights Foundation, Inc., in support of the defendant; and the Attorney General.  
            [2] Because neither party raised the issue of the constitutionality of § 10 (b) under the cognate Massachusetts constitutional provision, art. 17 of the Massachusetts Declaration of Rights, we need not -- and do not -- address it.   
            [3] In relevant part, G. L. c. 269, § 10 (b), provides:
"Whoever, except as provided by law, carries on his person, or carries on his person or under his control in a vehicle, any . . . switch knife, or any knife having an automatic spring release device by which the blade is released from the handle, having a blade of over one and one-half inches . . . shall be punished by imprisonment for not less than two and one-half years nor more than five years in the state prison, or for not less than six months nor more than two and one-half years in a jail or house of correction, except that, if the court finds that the defendant has not been previously convicted of a felony, he may be punished by a fine of not more than fifty dollars or by imprisonment for not more than two and one-half years in a jail or house of correction."  
            [4] The Supreme Court placed the burden on the government at the second step of the Bruen analysis, without specifying who bears the first-step burden.  The Commonwealth contends the defendant, as the person challenging the constitutionality of § 10 (b), bears this initial burden.  We need not answer which party has the burden of proof at the first step of the Bruen analysis to resolve this case.  
            [5] Importantly, the Supreme Court explicitly rejected a different two-part analytical framework the United States Courts of Appeals had developed in the years leading up to Bruen.  That framework combined a historical analysis with the application of means-end scrutiny, which the Bruen majority concluded was "inconsistent with Heller's historical approach."  Bruen, 597 U.S. at 24.
            [6] As discussed later, we conclude they are.
            [7] See Aymette v. State, 21 Tenn. (2 Hum.) 154, 159 (1840) ("The Legislature . . . have a right to prohibit the wearing or keeping [of bowie knives as] weapons dangerous to the peace and safety of the citizens, and which are not usual in civilized warfare"); English v. State, 35 Tex. 473, 474 (1871) (categorizing pistols, dirks, daggers, slungshots, swordcanes, spears, brass-knuckles and bowie knives as "wicked devices of modern craft"); State v. Workman, 35 W. Va. 367, 373 (1891) ("weapons as are usually employed in brawls, street fights, duels, and affrays," such as "dirk, bowie-knife, razor, slung-shot," or false knuckles, are not protected).  
            [8] For example, a dirk knife is "a long straight-bladed dagger formerly carried [especially] by the Scottish Highlanders" or "a short sword formerly worn by British junior naval officers" (citation omitted).  Wood ex rel. Wood v. Henry County Pub. Sch., 255 Va. 85, 95 n.6 (1998).  A bowie knife is defined as "a large hunting knife adapted . . . for knife-fighting . . . having a guarded handle and a strong single-edge blade" typically ten to fifteen inches long (citation omitted).  Id.  
            [9] The Commonwealth contends most States either banned or severely restricted switchblades in the 1950s and 1960s, making the regulation of switchblades a national tradition.  However, these laws were first enacted in response to sensationalized portrayals of switchblades as weapons solely intended for criminality.  See Kopel, Cramer, & Olson, Knives and the Second Amendment, 47 U. Mich. J.L. Reform 167, 176 (2013).  Even if the Commonwealth presented some evidence switchblades are, in fact, more likely to be used for criminal purposes, and it did not, Bruen expressly forecloses any means-ends scrutiny.  See Bruen, 597 U.S. at 19.  In any event, Bruen makes clear historical regulations dating to the mid-Twentieth Century have, at best, marginal evidentiary value.  See id. at 35 ("we must also guard against giving postenactment history more weight than it can rightly bear").  As such, these regulations, no matter how numerous, cannot establish the original meaning of the Second Amendment right, as required under Bruen.  See id. at 37 ("we have generally assumed that the scope of the protection . . . is pegged to the public understanding of the right when the Bill of Rights was adopted").  
            [10] Although the Supreme Court has yet to clarify how and where the "common use" standard fits within Bruen's two-part framework, we need not resolve this issue for the purpose of this case.  See Bevis v. Naperville, Ill., 85 F.4th 1175, 1198 (7th Cir. 2023) ("There is no consensus on whether the common-use issue belongs at Bruen step one or Bruen step two").  
            [11] See Cal. Penal Code § 21510 (legal so long as blade is less than two inches long); Conn. Gen. Stat. § 53-206 (one and one-half inch restriction); Del. Code Ann. tit. 11, § 1446 (categorical ban); D.C. Code § 22-4514 (same); Haw. Rev. Stat. § 134-52 (same); Minn. Stat. § 609.66 (same); N.M. Stat. Ann. § 30-7-8 (same); N.Y. Penal Law § 265.01 (same); N.C. Gen. Stat. § 14-269(a) (same); Wash. Rev. Code § 9.41.250 (same).  
            [12] While we are satisfied in this case the "common use" test has been met, we express no opinion whether jurisdictional commonality should be the definitive statistical approach.
            [13] Alternatively, "dangerous and unusual" may be further dissected such that "dangerous" focuses on a weapon's physical characteristics and "unusual" focuses on whether the weapon is in "common use."  See Hollis, 827 F.3d at 448-449 (separately analyzing "dangerousness" and "unusualness").  
            [14] We are mindful, when confronting a constitutional flaw in a statute, we only "sever its problematic portions while leaving the remainder intact."  Ramirez v. Commonwealth, 479 Mass. 331, 338 (2018).  As such, § 10 (b) is invalidated only with respect to the prohibitions regarding switchblade knives.