No. 48 November 25, 2025 461

# IN THE SUPREME COURT OF THE STATE OF OREGON

STATE OF OREGON,
*Respondent on Review,*

*v.*

ANTHONY RICHARD CORTES,
*Petitioner on Review.*

(CC 22CR10579, CC 22CR27721)
(CA A179865 (Control), A179866) (SC S071161)

En Banc

On review from the Court of Appeals.*

Argued and submitted April 17, 2025.

Francis C. Gieringer, Deputy Public Defender, Oregon Public Defense Commission, Salem, argued the cause and filed the briefs for petitioner on review. Also on the briefs was Ernest G. Lannet, Chief Defender, Criminal Appellate Section.

Robert A. Koch, Assistant Attorney General, Salem, argued the cause and filed the briefs for respondent on review. Also on the brief were Dan Rayfield, Attorney General, and Benjamin Gutman, Solicitor General.

JAMES, J.

The decision of the Court of Appeals is reversed. The judgments of the circuit court are reversed, and the case is remanded to the circuit court for further proceedings.

Bushong, J., dissented and filed an opinion, in which Garrett, J., joined.

_____
* Appeal from Douglas County Circuit Court, Robert B. Johnson, Judge. 332 Or App 685, 549 P3d 618 (2024).

**JAMES, J.**

In William Shakespeare's Macbeth, Act 2, Scene 1, the titular character asks, "Is this a dagger which I see before me, the handle towards my hand?" As this case illustrates, the answer to that question is not always obvious.

Defendant, who is houseless, is on probation and subject to the general conditions of probation provided for by Oregon law. Those conditions include the requirement that a probationer shall "[n]ot possess weapons, firearms or dangerous animals." ORS 137.540(1)(j). Defendant's probation officer issued a probation violation report alleging that defendant had violated the general weapons condition when he reported to the probation office with a knife in his backpack. At the probation violation hearing, defendant claimed that, although it was a knife, it was a steak knife, and it was therefore not a weapon but a tool, an essential eating implement that defendant carried in his backpack by necessity because, being houseless, he carried all his worldly possessions upon his person.

The trial court rejected defendant's argument that the knife—even if it was a steak knife—was not a weapon for purposes of the probation statute. The Court of Appeals affirmed without opinion. *State v. Cortes*, 332 Or App 685, 549 P3d 618 (2024). We allowed review to consider whether defendant violated the weapons condition in ORS 137.540(1)(j). The debate in this case might appear ontological in nature: What makes a weapon a weapon? What characteristics give an object weapon*ness*? But, we need not resolve those deeper philosophical questions. Our task is more grounded; we are only called upon to decide what the Oregon legislature intended to be considered a weapon for purposes of ORS 137.540. Here, based on the text, context, and legislative history of ORS 137.540(1)(j), and considering maxims of constitutional avoidance, we hold that the legislature intended for the term "weapons," as used in that statute, to apply to instruments designed primarily for offensive or defensive combat or instruments that would reasonably be recognized as having substantially the same character, and not to tools or objects designed primarily for utility, even when those tools can be used as weapons under

some circumstances. Based on that definition, we conclude that the trial court erred in concluding that defendant had violated the weapons condition without first engaging in a factual inquiry about the knife at issue and making a factual determination as to whether it was a knife that was designed primarily for offensive or defensive combat, or one that would reasonably be recognized as having substantially the same character, as opposed to a knife designed primarily for utility. Accordingly, we reverse the decision of the Court of Appeals and the trial court's judgments. The case is remanded to the trial court for further consideration in light of this opinion.

## I.   BACKGROUND

At the time of the alleged probation violation giving rise to this case, defendant was serving two separate terms of probation arising out of two separate criminal cases. In the first, defendant pleaded no contest to three counts of computer crime, ORS 164.377(2), after he used a school district's credit card to make unauthorized purchases. In the second, defendant pleaded no contest to, among other charges, burglary in the second degree, ORS 164.215, and criminal mischief in the second degree, ORS 164.354, for breaking into a marijuana dispensary and an adjoining laundromat. As a result of those pleas, defendant was sentenced to a total of five years' probation and was "subject to all general conditions of probation." One of those conditions provided that defendant "shall [n]ot possess weapons, firearms or dangerous animals." ORS 137.540(1)(j). Douglas County probation officer Vidal was assigned to supervise defendant on both of his probation cases.

During probation intake, defendant was provided a "weapons notice," a document apparently created by the Douglas County probation office, which informed defendant of what that office considered to be prohibited weapons:

"All persons on supervision for felony or misdemeanor, general condition [ORS 137.540(1)(j)] states don't possess weapons, firearms, or dangerous animals. While on supervision you are not allowed to possess or have custody and control of any weapons capable of causing physical injury. This includes, but is not limited to, archery equipment,

crossbow, tear gas, mace, pepper sprays, all knives, and work tools such as utility knives or any other items your [probation officer] considers weapons."[1]

The wording of that notice does not track ORS 137.540, which does not specify that "all knives" or "work tools" are *per se* "weapons." Based on that notice, Vidal advised defendant to keep anything that he considered a tool, and not a weapon, in "a toolbox or *** somewhere where he keeps the tools." At some point during the intake or a supervision meeting, Vidal became aware that defendant was unhoused.

The events giving rise to the probation violation in this case occurred during a scheduled meeting between defendant and Vidal. After learning that defendant had arrived at the probation office, Vidal went to call him from the lobby for their appointment. As defendant approached, Vidal observed that defendant was carrying a backpack and "noticed a handle of [a] knife sticking out from [his] backpack." Defendant complied with Vidal's instruction to stop and drop the backpack, and Vidal removed the knife from the bag. The knife was nine inches long, and the blade was four-and-a-half inches in length and had a rounded tip. Based on defendant's possession of that knife, Vidal arrested defendant and filed a violation report, alleging that he had violated the weapons condition and seeking the revocation of his probation.

At the probation revocation hearing, Vidal testified about his supervision of defendant and the events leading up to defendant's arrest. After Vidal testified that the knife found in defendant's backpack violated the weapons condition, defense counsel asked Vidal to explain what constituted a "weapon" under ORS 137.540(1)(j):

"[DEFENSE COUNSEL:]   Have you received training on what a weapon is?

"[VIDAL:]   Yes.

"[DEFENSE COUNSEL:]   Okay. And what is the definition of a weapon?

"[VIDAL:]   Anything that can cause me harm.

---

[1] Although a copy of the weapons notice was not introduced into evidence, Vidal testified to its contents during defendant's probation violation hearing.

"[DEFENSE COUNSEL:] So what's the definition, what's the difference between a weapon and a tool?

"[VIDAL:] When he did an intake we have a weapons notice and tell him that any weapon, anything that's considered a tool needs to be in a tool, a toolbox or in, in, in somewhere where he keeps the tools."

Vidal then described the knife that he had found in defendant's backpack, comparing it to a "steak knife." Vidal testified that he had not "tr[ied] the blade" and explained that "the inches of the knife to me is [what constitutes a weapon, that] which could potentially cause me harm." Vidal also explained that the "weapons notice" that defendant signed provided that "all knives" were considered weapons.

When defense counsel sought further clarification on Vidal's understanding of what qualified as a "weapon," Vidal testified that the meaning of the term depended, to some extent, on context:

"[DEFENSE COUNSEL:] Okay. So you said that a weapon is anything that can cause harm?

"[VIDAL:] To me. Yes.

"[DEFENSE COUNSEL:] Okay. So what's, so is he not allowed to have scissors?

"[VIDAL:] He needs to, if he's putting, sticking out, or he's pointing to the sides, pointing to me. Yes. It's a weapon.

"[DEFENSE COUNSEL:] So he's not allowed to have a screwdriver?

"[VIDAL:] If he [has] put it in his hands and points it towards to me. No.

"[DEFENSE COUNSEL:] Okay. So you said he wouldn't be allowed to have scissors if he was pointing them at you but he didn't point that knife at you that day, did he?

"[VIDAL:] No normal person [would] be walking around with a knife that big in his bag sticking out."

Despite his earlier testimony that "all knives" constituted weapons under the weapons provision, Vidal

testified that there were some scenarios where a probationer would be permitted to possess a knife:

> "[DEFENSE COUNSEL:]   So is it your position that if he's about to sit down for dinner and he has a steak knife next to him he needs to call you first and ask whether or not he can use that to eat his food?

> "[VIDAL:]   If he's using it to just eat, yes. No. Sorry. No. But if he's walking around with a knife in his backpack he shouldn't be."

After Vidal testified, the state argued that the knife violated the weapons condition because defendant had been told that he could not possess any instrument that could harm his probation officer, and the knife could "clearly cause harm."

In response, defendant argued that possessing the knife did not violate probation because it was not a weapon under ORS 137.540(1)(j):

> "Your Honor, our first argument, that this is not a weapon that is intended to be used under the probation violation statute. This knife, while it was a steak knife is what it was defined as. Something that had a rounded tip. Something similar to what you would get at [a steakhouse] to butter your rolls or use it on your steak.

> "The notice requirement is just insufficient. All knives doesn't mean that you can't use a tool for eating or you can't use a tool to cut. And so at that point it becomes insufficient and doesn't provide proper notice on when or when he cannot use any kind of eating utensil or any kind of tool. For those reasons we would argue that it's not a weapon as that's mentioned under the conditions of probation statute."

Following argument, the trial court concluded on the record that defendant had violated the weapons condition:

> "Okay. I do find that he's in violation of his probation. This is clearly a knife. And under the, the weapons provision that the Probation Officer read[,] this clearly constitutes a weapon."

The court denied the state's request to revoke probation and imposed a 30-day jail sentence.

Defendant appealed, reprising his arguments from the trial court. In response, the state argued that the legislature intended for the weapons provision to be interpreted broadly and that the ordinary meaning of the word "weapon" included not only instruments or objects designed for combat but anything used or *usable* to injure or fight a person. The state did not contend that the knife confiscated from defendant was specifically designed to cause injury. Instead, the state argued that the trial court could infer from the way defendant was carrying the knife—with the handle displayed outside of his backpack—that "defendant was carrying the knife to protect himself or to fight someone." In other words, the state argued that the trial court could appropriately find that "possessing a steak knife in that way made the knife *usable* as a weapon, which is prohibited by ORS 137.540(1)(j)." (Emphasis in original.)

The Court of Appeals affirmed without opinion, *State v. Cortes*, 332 Or App 685, 549 P3d 618 (2024), and defendant filed a petition for review, which we allowed.

## II.   ANALYSIS

ORS 137.540 provides that a trial court "may sentence the defendant to probation subject to [several] general conditions unless specifically deleted by the court." At issue in this case is whether defendant's knife was a "weapon" under the general probation condition that prohibits a probationer from possessing "weapons, firearms or dangerous animals." ORS 137.540(1)(j).

According to defendant, he did not violate the weapons condition because a "weapon" is an instrument specifically designed for combat and the record did not support a finding that defendant's knife was a weapon, because his knife lacked features of other bladed instruments designed for combat and defendant did not use the knife in combat. The state, on the other hand, asserts that defendant violated ORS 137.540(1)(j) because (1) this court has determined, as a matter of law, that "knives are both a tool *and* a weapon designed to cause physical injury" and (2) defendant's mere possession of the knife in this case constituted a violation of the weapons condition.

As can be seen from the parties' arguments, the issue presented in this case contains both factual and legal dimensions. Because the parties' factual arguments turn in large part on their legal arguments about the meaning of "weapons" in ORS 137.540(1)(j), we begin with the legal issues. After applying our traditional method of statutory interpretation to determine the meaning of "weapons," we consider whether, when viewed in the light most favorable to the state, the record supports the trial court's finding that defendant's possession of the knife in this case violated the weapons condition. *See, e.g.*, *State v. Wallace*, 373 Or 122, 133, 561 P3d 602 (2024) (setting out analytical structure for cases where the sufficiency of the evidence depends on a matter of statutory interpretation).[2]

A.   *Meaning of "Weapons" in ORS 137.540(1)(j)*

The meaning of the weapons provision in ORS 137.540 presents an issue of statutory interpretation. Accordingly, we turn to the familiar analytical framework set out in *State v. Gaines*, 346 Or 160, 206 P3d 1042 (2009). Under that framework, we examine the text and context of ORS 137.540(1)(j), together with the relevant legislative history, all with the "paramount goal" of determining the legislature's intent. *Gaines*, 346 Or at 171-72.

1.   *Textual analysis*

ORS 137.540(1)(j) provides:

"(1)   The court may sentence the defendant to probation subject to the following general conditions unless specifically deleted by the court. The probationer shall:

"* * * * *

"(j)   Not possess weapons, firearms or dangerous animals."

The legislature did not provide a definition for "weapons." When a statutory term is undefined, this court "'ordinarily look[s] to the plain meaning of a statute's text

---

[2] As noted previously, the "weapons notice" provided to defendant defined "weapons" to include all knives. That definition is not determinative here. The authority of a probation officer derives from the conditions of probation imposed by statute, and the court. ORS 137.630. The issue here is what the legislature, not the probation office, intended "weapons" to encompass.

as a key first step in determining what particular terms mean.'" *State v. Gonzalez-Valenzuela*, 358 Or 451, 460, 365 P3d 116 (2015) (quoting *Comcast Corp. v. Dept. of Rev.*, 356 Or 282, 295, 337 P3d 768 (2014)). To help determine that plain meaning, this court often "consult[s] dictionary definitions of the relevant terms," while recognizing that those definitions "lack context and often fail to capture the nuanced connotations conveyed by the normal use of a term in a particular context." *Id*. at 461. In other words, although dictionary definitions provide "some evidence of meaning," they "should not be relied on to resolve a dispute about plain meaning without critically examining how the definitions fits into the context of the statute itself." *Id*.

The various dictionary definitions for the term "weapon" highlight the dangers of relying solely on dictionary definitions to determine the plain meaning of a statute. *Webster's* defines "weapon" as "an instrument of offensive or defensive combat **:** something to fight with **:** something (as a club, sword, gun, or grenade) used in destroying, defeating, or physically injuring an enemy." *Webster's Third New Int'l Dictionary* 2589 (unabridged ed 2002). *Webster's* further defines "instrument" as "a means whereby something is achieved, performed, or furthered." *Id*. at 1172. "Instrument" can be a synonym for "utensil" and "implement." *Id*. All three terms refer to a device used "for performing a mechanical or manual operation," but instrument "suggests delicate construction or precision work as in dentistry, surgery." *Id*. at 1134. The term is used to connote a device that is "any more or less precise * * * for achieving any end." *Id*. By contrast, "utensil" and "implement" suggest a broader category of objects used to carry out a task. Implement "applies to anything, usu[ally] a contrivance, necessary to effect an end or perform a task." *Id*. Finally, utensil "suggests something useful in accomplishing work, esp[ecially] domestic work or work similar to it, and usu[ally] manageable by hand." *Id*. Accordingly, as used in *Webster's*, "weapon" can mean an instrument designed for combat or an item used or usable in combat.

Other dictionaries define "weapon" in terms of design or use. *American Heritage* defines "weapon" as "[a]n instrument of attack or defense in combat, as a gun, missile,

or sword. \*\*\* A means used to defend against or defeat another." *The American Heritage Dictionary* 1961 (5th ed 2011). And *Black's* defines "weapon" as "[a]n instrument of offensive or defensive combat, or anything used, or designed to be used, in destroying, defeating, threatening, or injuring a person." *Black's Law Dictionary* 1593 (6th ed 1990). In addition to defining the general term "weapon," *Black's* provides definitions for specific types of weapons. Several of those definitions focus on the design of the object. *See, e.g.*, *Black's* at 1081 (defining "offensive weapon"—in the context of criminal law and statutes—as an article "primarily meant or adapted for attack and the infliction of injury"); *Black's Law Dictionary* 1909 (11th ed 2019) (defining "electroshock weapon" as "[a] handheld device *designed* to incapacitate a person by administering a painful electric shock that disrupts musculoskeletal function" (emphasis added)).

Those definitions help show that, although the word "weapon" is part of our common parlance, its meaning proves quite mercurial—ranging from a narrow class of objects specifically designed for combat to anything that can be used to cause physical harm to another. The slippery nature of the term may be best seen in the fact that both the state and defendant cite the same dictionary definitions yet reach different understandings of what constitutes a "weapon." For defendant, the term "weapon" covers a narrow class of instruments or objects specifically designed or intended for use in combat. The state, in turn, reads the term more broadly, focusing on an understanding of "weapon" that includes any object that could be used to cause injury.[3] Accordingly, we turn to context to help clarify the meaning of "weapons" for purposes of ORS 137.540(1)(j). *See Kohring v. Ballard*, 355 Or 297, 304, 325 P3d 717 (2014) (explaining that "we examine word usage in context to determine which among competing definitions is the one that the legislature more likely intended").

## 2. Contextual analysis

"A statute's context includes, among other things, its immediate context—the phrase or sentence in which

___

[3]    The state has proffered several alternative definitions for the meaning of "weapon" as used in ORS 137.540(1)(j).

the term appears—and its broader context, which includes other statutes on the same subject." *Shepard Inv. Grp. LLC v. Ormandy*, 371 Or 285, 290, 533 P3d 774 (2023). A statute's context also includes the preexisting statutory framework within which the statute was enacted and prior opinions of this court interpreting the relevant statutory wording. *Ogle v. Nooth*, 355 Or 570, 584, 330 P3d 572 (2014) (citing *Polacek and Polacek,* 349 Or 278, 284, 243 P3d 1190 (2010)). We begin by providing an overview of the history of probation supervision in Oregon to provide context for the weapons condition and the broader statutory scheme governing probation. *Swarens v. Dept. of Rev.*, 320 Or 326, 331, 883 P2d 853 (1994) ("The context of a statute includes the statute's development through successive legislatures.").

a.   History of probation supervision

The history of probation supervision provides important context for understanding the meaning of the weapons condition. Although the current version of the weapons condition was not enacted until 1993, Or Laws 1993, ch 680, § 16, the legislature has regulated the conditions of probation for much longer.

The legislature first enacted a statute concerning probation in 1931. Or Laws 1931, ch 396. Under that new law, courts were given the power to place criminal defendants on probation if it appeared that probation would serve "the best interests of the public as well as of the defendant." Or Laws 1931, ch 396, § 1. If a sentencing court determined that probation was appropriate, it was required to determine the conditions of probation. Or Laws 1931, ch 396, § 3.[4] The original supervision conditions statute did not list

---

[4] Or Laws 1931, ch 396, § 3 provided:

"The court shall determine and may at any time modify the conditions of probation and may include among them the following, or any other: That the probationer (1) shall avoid injurious or vicious habits; (2) shall avoid places or persons of disreputable or harmful character; (3) shall report to the probation officer as directed by the court or probation officer; (4) shall permit the probation officer to visit him at his place of abode or elsewhere; (5) shall answer all reasonable inquiries on the part of the probation officer; (6) shall work faithfully at suitable employment; (7) shall remain within a specified place; (8) shall pay his or her fine, if any, in one or several sums; (9) shall make reparation or restitution to the aggrieved parties for the damage or loss caused by offense, in an amount to be determined by the court; (10) shall support his dependents."

required conditions of probation; instead, the law provided a list of nonexclusive conditions that a court could impose. *Id*. Notably, none of those conditions concerned the possession of weapons. *Id*. Once a court had identified the supervision conditions for a given probationer, the probation officer was required to provide the probationer with a statement of the conditions and instruct them on the meaning. Or Laws 1931, ch 396, § 6(4). When the Oregon Revised Statutes were compiled in 1953, the required probation supervision conditions were set out in ORS 137.540.

The probation statutes quickly assumed a central role in Oregon's criminal legal system and, by the 1970s, the majority of criminal defendants were being placed on probation supervision. *State v. Martin*, 282 Or 583, 588 n 3, 580 P2d 536 (1978). With the rise of probation supervision came increased litigation over the conditions of probation. In considering whether a condition of probation imposed under the original probation statute was valid, this court explained that it was required to assess whether the condition was proportionate to the offense and the purposes of probation. *Id*. at 588.[5] We then identified three principal purposes of probation: rehabilitation, freedom of the individual, and the maintenance of public safety. *Id*.; *see also Sobota v. Williard*, 247 Or 151, 153, 427 P2d 758 (1967); *Barker v. Ireland*, 238 Or 1, 4, 392 P2d 769 (1964).

In 1981, the legislature restructured the probation statutes, introducing the concept of general and special conditions of supervision as part of House Bill (HB) 2317. Or Laws 1981, ch 671, § 1. According to the available legislative history, the Corrections Division and the Attorney General's Office drafted and introduced HB 2317 based on growing concerns that sentencing courts were too vague in imposing supervision conditions, which resulted in probation

---

[5] The issue in *Martin* arose out of probation conditions that the trial court had imposed as a result of the defendant's guilty plea. At the time that *Martin* was decided, *former* ORS 138.050 (1975), *repealed by* Or Laws 2017, ch 529, § 26, allowed defendants who had pleaded guilty to appeal only from a judgment of conviction that imposed "an excessive fine or excessive, cruel or unusual punishment not proportionate to the offense has been imposed." Although the defendant in *Martin* also raised a constitutional challenge to her probation conditions, this court decided the case on statutory proportionality grounds, concluding that the condition violated *former* ORS 138.050 (1975). 282 Or at 589.

officers struggling to impose conditions to effectuate what the officers believed was the sentencing court's intent. Tape Recording, House Committee on Judiciary, HB 2317, Jan 26, 1981, Tape 22, Side A (statement of O.R. Chambers, Executive Assistant, Corrections Division). The drafters explained that those vague conditions had led to problems where probation officers misinterpreted the sentencing court's intent.

To address that problem, the drafters proposed a system of general and special conditions—set out in ORS 137.540—that would provide greater clarity to probation officers by setting standard conditions for all probationers while maintaining judicial discretion to impose conditions based on a criminal defendant's offense. ORS 137.540(1) (1981) set forth 15 general conditions applicable to all probationers—regardless of the offense—unless specifically deleted by the sentencing court. ORS 137.540(2) (1981), meanwhile, authorized sentencing courts to impose special conditions of probation for "the protection of the public or reformation of the offender." It was in that 1981 legislation that the legislature first enacted a supervision condition concerning weapons. As a special condition of probation, the sentencing court was permitted to impose a condition that a probationer "[n]either own, possess nor control any firearm or any other specified weapon." ORS 137.540(2)(k) (1981).

In 1993, the legislature enacted the current weapons condition set out in ORS 137.540(1)(j) as part of a broader attempt to restructure the probation-related statutory scheme. Before the 1993 amendments, only the courts had the authority to adjudicate and sanction probationers for probations violations. To ease the burden on judicial and correctional resources, the legislature passed Senate Bill (SB) 139 to create a system of "structured, intermediate sanctions" that could be imposed by a probation officer. Or Laws 1993, ch 680, §§ 10-14. Notably, although SB 139 empowered the Department of Corrections to develop the system of structured sanctions, it preserved the legislature and the courts' roles in defining the conditions of supervision. In other words, although the legislature expanded the authority of probation officers by allowing them to impose

sanctions, nothing in the legislative record suggests that the legislature intended to grant probation officers discretion to independently impose the conditions of probation, nor interpret imposed conditions in a manner as to expand those conditions beyond legislative or judicial intent.

In addition, the drafters of SB 139 explained that the purpose of the bill was to balance correctional resources, create more predictability for probationers and officers about violations and potential consequences, and to systematize a sanctions structure. *See, e.g.*, Tape Recording, Senate Committee on Ways & Means, Subcommittee on Public Safety, May 14, 1993, SB 139, Tape 26, Side A and Tape 27, Side A (statement of Judge Ellis discussing how the bill will reduce use of jail and prison beds and allow for probationers to know, with certainty, when conduct will result in sanctions). The legislature ultimately enshrined those policy objectives in ORS 137.592, which states:

"The Legislative Assembly finds that:

"(1)  To protect the public, the criminal justice system must compel compliance with the conditions of probation by responding to violations with swift, certain and fair punishments.

"(2)  Decisions to incarcerate offenders in state prisons for violation of the conditions of probation must be made upon a reasonably systematic basis that will insure that available prison space is used to house those offenders who constitute a serious threat to the public, taking into consideration the availability of both prison space and local resources."

The development of the probation statutes since 1931 provides several important contextual clues for interpreting the weapons provision in ORS 137.540(1). First, the purpose of the probation system is to promote a probationer's freedom and need for rehabilitation so long as those interests are consistent with public safety. *Martin*, 282 Or at 588; *see also State v. Donovan*, 307 Or 461, 770 P2d 581 (1989). Second, it is Oregon's policy to ensure that the probation system operates in a swift, certain, and consistent manner. To achieve that policy, the legislature has developed a system of general and specific conditions of probation

with the goal of limiting the discretion of probation officers to interpret judgments while, at the same time, providing probationers with clear notice of what conduct is prohibited and required while under supervision.

With that context in mind, it is unlikely that the legislature intended for "weapons" to mean literally anything capable of being used to inflict injury. Such a definition would capture a nearly endless number of objects and would give probation officers unreasonably broad authority to determine what objects constitute weapons. That result would deprive probationers of fair notice about what conduct would constitute a violation. Moreover, it would lead to arbitrary enforcement, with each probation officer determining individually whether a particular object is a weapon in a particular circumstance, as exemplified by the testimony of the probation officer in this case who, when asked to define a weapon, said it was "[a]nything that can cause me harm."

> b.  Reading "weapons" in the context of ORS 137.540(1)(j)

We continue our contextual analysis by turning to other words and phrases used in ORS 137.540(1)(j) to determine whether that context provides additional insight into the meaning of the weapons provision. *See Goodwin v. Kingsmen Plastering, Inc.*, 359 Or 694, 702, 375 P3d 463 (2016) ("It is a familiar rule that the meaning of words in a statute may be clarified or confirmed by reference to other words in the same sentence or provision."). In addition to forbidding people on probation from possessing weapons, ORS 137.540(1)(j) also prohibits those individuals from possessing firearms and dangerous animals.

According to the state, the words immediately following the word weapons—"firearms" and "dangerous animals"—"connote[] objects both designed and having the potential to cause harm" because, while it is true that "[f]irearms are designed for force[,] dangerous animals are not designed in the same way but can cause physical harm." We disagree. Contrary to the state's assertions, that context does not support a broad definition of "weapons" that

"connotes objects both designed and having the potential to cause harm."

We note that the Oregon Criminal Code tends to define firearms in terms of design. ORS 166.210—which provides the applicable definitions for terms used in, among other laws, the crime of unlawful possession of firearms, ORS 166.250, and the statutory requirements for the transfer and sale of firearms, ORS 166.410 - 166.470—defines "firearm" as "a weapon, by whatever name known, which is *designed* to expel a projectile by the action of powder." ORS 166.210(3) (emphasis added). In addition to providing that general definition, the statute provides definitions for specific subtypes of firearms, relying again on particular design elements as the foundation for those definitions. *See, e.g.*, ORS 166.210(6) (defining "handgun" as "any pistol or revolver using a fixed cartridge containing a propellant charge, primer and projectile, and designed to be aimed or fired otherwise than from the shoulder"); ORS 166.210(7) (defining "machine gun" as "a weapon of any description by whatever name known, loaded or unloaded, which is designed or modified to allow two or more shots to be fired by a single pressure on the trigger device").

Nor do we find the use of term "dangerous animal" particularly supportive of the state's "use-based" reading of weapon. We presume that the legislature was aware of existing law—including the common law—at the time that it enacted ORS 137.540(1)(j). *See Blachana, LLC v. Bureau of Labor & Indus.*, 354 Or 676, 691, 318 P3d 735 (2014). At the time that that provision was enacted, the legislature had not previously used or defined the term "dangerous animals."[6] However, although the legislature had not used that term at the time, this court had—specifically in the context of tort liability. *See Lange By & Through Lange v. Minton*, 303 Or 484, 738 P2d 576 (1987) (assessing tort liability for ordinance prohibiting the possession of exotic,

---

[6] Although the legislature did not enact any law concerning "dangerous" animals until 2005, Or Laws 2005, ch 840, § 2(2) (setting out "the crime of maintaining a dangerous dog"), some municipalities had enacted ordinances regulating the possession of dangerous animals. *See Lange By & Through Lange v. Minton*, 303 Or 484, 491-92, 738 P2d 576 (1987) (discussing Salem ordinance that prohibited the possession of "[a]n exotic, wild, or dangerous animal").

wild, or dangerous animals); *Westberry v. Blackwell*, 282 Or 129, 131-33, 577 P2d 75 (1978) (discussing potential tort liability for dangerous animals). In those cases, this court considered whether a person's possession of a particular animal could give rise to liability for the harm caused by that animal, often relying on principles set out in *Restatement (Second) of Torts* (1974). *See, e.g.*, *Westberry*, 282 Or at 133 (citing to *Restatement*); *Chance v. Ringling Bros. Barnum & Bailey, Combined Shows, Inc.*, 257 Or 319, 478 P2d 613 (1970) (same).

The term "dangerous animal" has a particular meaning in tort law. Although that meaning is not based on design in the way that firearms are designed, it does rely on a similar rationale of categorization based on specific and identifiable characteristics. The *Restatement* imposes strict liability on the possessor of wild animals on the theory that those animals have certain dangerous traits that arise from their particular class or species. *Restatement* § 506(1) (defining a "wild animal" as "an animal that is not by custom devoted to the service of mankind at the time and in the place in which it is kept"); *Restatement* § 506 comment b (explaining that as a general rule "wild animals are dangerous"); *Restatement* § 507 comment c ("One who keeps a wild animal is required to know the dangerous propensities normal to the class to which it belongs. *** Thus a keeper of an elephant that for years has shown none of the dangerous traits common to elephants as a class is liable under the rule stated in this Section if the elephant suddenly and unexpectedly exhibits these traits."). The *Restatement* also recognizes that there are some classes or species of domestic animals that, as a group, have dangerous characteristics. *Restatement* § 509 comment e ("There are certain classes of domestic animals in which dangerous propensities are normal although abnormal in other classes of their species.").

It is true individual animals can be classified as dangerous if that animal has actually harmed or threatened to harm another. *See Black's* at 1593 (defining "dangerous animal" as "[a]n animal that has harmed or has threatened to harm a person or another animal"). But the concept of "dangerous animals" weaves aspects of nature or design,

and use or behavior, in such a way that is fails to provide convincing context for either approach.

   c.   Reading   "weapons"   in   the   context   of
        ORS 137.540 as a whole

A statute's context also includes other provisions of the same statute. *See Lane County v. LCDC*, 325 Or 569, 578, 942 P2d 278 (1997) (explaining that, when construing a statute, "we do not look at one subsection of a statute in a vacuum; rather, we construe each part together with the other parts in an attempt to produce a harmonious whole"). When a statute contains several provisions, this court endeavors to adopt a construction that gives effect to the entirety of the statute. *See* ORS 174.010 ("In the construction of a statute, the office of the judge is simply to ascertain and declare what is, in terms or in substance, contained therein, * * * and where there are several provisions or particulars such construction is, if possible, to be adopted as will give effect to all."). Indeed, "[a]s a general rule, we also assume that the legislature did not intend any portion of its enactments to be meaningless surplusage." *State v. Clemente-Perez*, 357 Or 745, 755, 359 P3d 232 (2015); *see also SAIF v. Ward*, 369 Or 384, 398, 506 P3d 386 (2022) (explaining that "this court will generally attempt to avoid a statutory construction that creates redundancy in the way that the statute is read").

In this case, several other provisions and terms in ORS 137.540 provide additional contextual support for the conclusion that the legislature intended the term "weapons" in ORS 137.540(1)(j) to be understood to turn on whether a given instrument was designed for combat as opposed to whether an item was used or is usable to inflict injury. First, as noted, ORS 137.540(1)(j) prohibits a probationer from "possess[ing]" weapons, and, as we will explain, the word "possess" in that phrase informs our understanding of the word "weapons."

The word "possess" is not defined in ORS 137.540, but it has a specific meaning when used in the context of Oregon criminal law. As we explained in *State v. Fries,* 344 Or 541, 545-47, 185 P3d 453 (2008), the word "possess" encompasses two alternatives: (1) *physically* controlling the

property—what we call "actual" possession—and (2) exercising dominion or control over the property—what we call "*constructive*" possession. *See also State v. Barger*, 349 Or 553, 559, 247 P3d 309 (2011), *adh'd to as modified on recons*, 350 Or 233, 253 P3d 1030 (2011) (so holding). Similarly, ORS 161.015(9) provides that, in the Criminal Code, unless another statute specifically defines it otherwise, "possess" means "to have physical possession *or otherwise* to exercise dominion or control over property." ORS 161.015(9) (emphasis added). Said another way, when one physically holds a knife in one's hand, one is actually possessing the knife. When a person keeps a knife in a kitchen drawer, the person is still possessing the knife—via constructive possession—because the person exerts dominion or control over the home, and thus, over the knife in the drawer. Both actual and constructive possession are "possession."[7]

The definition of possession found in ORS 161.015(9) is not directly made applicable to ORS 137.540, yet it is still important context. If words in a statute have a well-defined legal meaning, then we will give those words that meaning in construing the statute. *Gaston v. Parsons*, 318 Or 247, 253, 864 P2d 1319 (1994); *see also State v. Perry*, 336 Or 49, 53, 77 P3d 313 (2003) (noting same). "Possession" is a well-defined term in criminal law, and, accordingly, the concepts of actual and constructive possession apply across a variety of statutes that concern possession of narcotics, pornography, and the like. We therefore understand the word "possess" in ORS 137.540, which is concerned with criminal probation, as it is commonly understood in other legal contexts, despite the statute itself not defining the term. *See McIntire v. Forbes*, 322 Or 426, 431, 909 P2d 846 (1996) ("Analysis of text also includes reference to wellestablished legal meanings for terms that the legislature has used."); *State v.*

---

[7] At the probation violation hearing, Vidal testified as follows:

"[DEFENSE COUNSEL:] So is it your position that if he's about to sit down for dinner and he has a steak knife next to him he needs to call you first and ask whether or not he can use that to eat his food?

"[VIDAL:] If he's using it to just eat *** [n]o. *** But if he's walking around with a knife in his backpack he shouldn't be."

That testimony suggests that one would not "possess" a knife when using it to eat but would "possess" a knife when carrying it in a backpack. That is incorrect, as just explained.

*Dumond*, 270 Or 854, 858, 530 P2d 32 (1974) ("[W]ords used in a statute which have a well defined legal meaning are to be given that meaning in construing the statute.").

When we look for the legislative intent behind a word choice in a statute, we presume that the legislature was aware of the existing law and the legal definitions and common understanding of terms used within the statute. *Martin v. City of Tigard*, 335 Or 444, 453, 72 P3d 619 (2003); *Ryerse v. Haddock*, 337 Or 273, 280-81, 95 P3d 1120 (2004) (noting same). Accordingly, in considering the use of the phrase "not possess weapons, firearms or dangerous animals" in ORS 137.540(1)(j), we presume that the legislature would have understood that it was prohibiting both actual and constructive possession. In other words, the legislature would have known that, in prohibiting a probationer from possessing weapons, it was prohibiting a probationer from not only holding a weapon or carrying it on their person, but also from keeping one in their home.[8]

Given the unambiguous meaning of the term "possess," we cannot conclude that the legislature intended the term "weapons" to be defined by potential use rather than design. The state's interpretation would require us to hold that a probationer would be prohibited from keeping any number of objects in their home, including, among other things, hammers, saws, axes for firewood, baseball bats, kitchen knives of all varieties, and many kinds of cutlery, even plastic picnic cutlery. We find it highly unlikely the legislature would have intended to put probationers in such a situation.

In addition, two other conditions of probation set out in ORS 137.540, when read together, provide important contextual support for the conclusion that the legislature did not intend for "weapons" to mean anything that could be used to inflict injury. ORS 137.540(1)(f) provides that a probationer must allow their probation officer to "visit the

---

[8] The dissent would interpret the term "possess," for purposes of ORS 137.540, as possession with intent to use. For the dissent, the object is not self-determinative of whether it is a weapon; rather, the dissent would find that it is a weapon for purposes of a probation violation if the probationer "possessed it as a weapon." __ Or at __ (Bushong, J., dissenting) (slip op at ___). A statute so written might have benefits over the statute at issue here, but it is not the statute before us.

probationer or the probationer's work site or residence and to conduct a walk-through of the common areas and of the rooms in the residence occupied by or under the control of the probationer."[9] And ORS 137.540(1)(g) authorizes a probation officer to request consent to search the probationer, their vehicle, or the premises if the officer has "reasonable grounds to believe that evidence of a violation will be found." To have "reasonable grounds," a probation officer must "possess information that causes the officer reasonably to believe that the probationer is violating a condition of probation and that a search of the probationer's person, residence, vehicle, or property would disclose evidence of a probation violation." *State v. Gulley*, 324 Or 57, 67, 921 P2d 396 (1996).

Thus, if the term "weapons" were understood to mean any object capable of causing injury to another, then it is hard to imagine any circumstance where a probation officer would not see something during a visit that would give the officer reasonable grounds to believe that evidence of a violation will be found, and that, in turn, would permit the officer to request consent to search. And refusal to provide consent can itself result in a probation violation. *State v. Reed*, 371 Or 478, 490, 538 P3d 195 (2023). The state has given us no reason to believe that the legislature intended to so broaden the circumstances under which probationers can be required to consent to a search.

d.   Related Statutes

A statute's context also includes related statutes. *State v. Klein*, 352 Or 302, 309, 283 P3d 350 (2012). ORS 166.240 criminalizes the concealed carrying of certain "sharp or blunt" weapons without regard to whether the possessor "intended unlawful use." *City of Portland v. Lodi*, 308 Or 468, 473, 782 P2d 415 (1989). In 1993, that statute provided:

"[A]ny person who carries concealed upon the person any knife having a blade that projects or swings into

_____

[9] The visitation condition was largely the same when the current weapons condition was enacted. In 1993, the visitation condition stated that a probationer shall "[p]ermit the probation officer to visit the probationer or the probationer's residence or work site, and report as required and abide by the direction of the supervising officer." ORS 137.540(1)(h) (1993).

position by force of a spring or by centrifugal force and commonly known as a switchblade knife, any dirk, dagger, ice pick, slung shot, metal knuckles, or any similar instrument by the use of which injury could be inflicted upon the person or property of any other person, commits a Class B misdemeanor."

ORS 166.240(1) (1977), *amended by* Or Laws 1989, ch 839, § 21. The catchall provision, "any similar instrument," was not intended "to outlaw the concealed carrying of any knife that was not a switchblade, dirk, or dagger." *Lodi*, 308 Or at 475. Instead, the legislature intended only to restrict the concealed carrying of certain types of bladed instruments that historically had been used in combat. *See State v. Delgado*, 298 Or 395, 401, 692 P2d 610 (1984) (noting that daggers were "primarily for combat" (citing Harold Peterson, *American Knives* (1958)); *see also* Peterson*, American Knives* at 2, 95, 102 (discussing how dirks are a type of knife that could be an "efficiently designed weapon" and was "a companion to and substitute for the sword"). Thus, when the legislature listed the bladed instruments that it considered to be weapons under ORS 166.240, it listed only those instruments designed for combat. It did not include steak knives, for example.

The state points to the definition of "weapon" in ORS 166.360 as relevant context. That statute defines various words and phrases for purposes of the statutory prohibition on possession of weapons in public buildings and court facilities. Under that statute, the term "weapon" is defined as, among other things, "[a]ny dirk, dagger, ice pick, slingshot, metal knuckles or any similar instrument or a knife, other than an ordinary pocketknife with a blade less than four inches in length, the use of which could inflict injury upon a person or property." ORS 166.360(10)(b). The state argues that that definition shows that the legislature has already made the policy decision to define *any* knife as a weapon "other than an ordinary pocketknife with a blade less than four inches in length." However, that definition was enacted 22 years after the weapons prohibition in ORS 137.540(1)(j), and, as noted, it applies only to the possession of weapons in public buildings and court facilities. Moreover, as the state acknowledged in argument before us, applying

that definition of "weapon" to the probation condition prohibiting possession of weapons would prohibit probationers in Oregon from possessing kitchen knives, a result that we are not persuaded that the legislature intended.

          e.   Case Law

Existing case law also forms a part of a statute's context. *State v. Eggers*, 372 Or 789, 800, 558 P3d 830 (2024). Here, the state argues that our decision in *Delgado* supports the proposition that knives are always both a tool and a weapon designed to cause physical injury. Accordingly, the state argues, we have already determined that all knives are, *per se*, weapons. We disagree.

The issue in *Delgado* was whether a switchblade was an "arm" protected under Article I, section 27, of the Oregon Constitution. There, the state argued that a switchblade pocketknife was not "not a weapon 'commonly used for personal defense.'" *Delgado*, 298 Or at 399. We rejected the state's "distinction [between] *** 'offensive' and 'defensive' weapons," reasoning that "[a]ll hand-held weapons necessarily share both characteristics." *Id*. at 399-400. We discussed the long and complicated history of knives "as both instruments of labor and combat" in the context of Article I, section 27. *Id*. at 402. Along the way, we noted that "knives have played an important role in American life, both as tools and as weapons. The folding pocketknife, in particular, since the early 18th century has been commonly carried by men in America and used primarily for work, but also for fighting." *Id*. at 403.

Contrary to the state's assertion, *Delgado* supports the proposition that objects in general, and knives in particular, possess a primary design, such that they can be designed primarily as tools, and others can be designed primarily to be weapons. *Delgado* held that a switchblade was an "arm" for purposes of the constitutional provision:

> "A switch-blade is defined as a 'pocketknife having the blade spring-operated so that pressure on a release catch causes it to fly open.' If ORS 166.510(1) proscribed the possession of mere pocketknives, there can be no question but that the statute would be held to conflict directly with Article I,

section 27. The only difference is the presence of the spring-operated mechanism that opens the knife. We are unconvinced by the state's argument that the switch-blade is so 'substantially different from its historical antecedent' (the jackknife) that it could not have been within the contemplation of the constitutional drafters."

*Id*. at 403 (citations omitted). We do not read *Delgado* to hold that all knives are, *per se*, always weapons, as that term is used in the statute at issue here.

### 3. Legislative History

Having considered text and context, we turn to legislative history. In 1981, the initial drafts of HB 2317—the bill that created general and special conditions of probation—prohibited a probationer from possessing "any firearm or any other specified weapon" as a general condition of probation. Stephen Griffith, legislative counsel, was concerned that the term "weapon" would lead to "line drawing problems" regarding kitchen knives, letter openers, ice picks and chains. Tape Recording, House Committee on Judiciary, HB 2317, Jan 26, 1981, Tape 22, Side A. Those concerns were echoed by the Metropolitan Public Defender (MPD), the Oregon Trial Lawyers Association (OTLA), and the Oregon District Attorney's Association (ODAA). Tape Recording, House Committee on Judiciary, HB 2317, Jan 26, 1981, Tape 22, Side A (statement of Marcy Hertzmark, representing MPD); Tape Recording, Senate Committee on Judiciary, HB 2317, May 7, 1981, Tape 167, Side B (statement of Jerry Cooper, representing the ODAA); Minutes, Senate Justice Committee, HB 2317, May 7, 1981 (statement of Richard Barton, representing OTLA).

Jerry Cooper, representing the ODAA, noted that "weapon" was subject to interpretation, and the definition of "deadly weapon" could provide a more precise definition because it would include instruments, such as switchblades, that were specifically manufactured for the purpose of injuring or killing someone.[10] Tape Recording, Senate

---

[10] Cooper's distinction between "deadly" and "dangerous" weapons was based on the definitions that the legislature had enacted in 1971 as part of the revision of the Criminal Code. The Commentary to Criminal Law Revision Commission Proposed Oregon Criminal Code provided several examples of non-firearm "instruments designed for offensive or defensive purposes," namely, "metallic

Justice Committee, HB 2317, May 7, 1981, Tape 167, Side B. A weapon, on the other hand, lacked clarity and "could be any piece of property; it's just the way it's attempted to be used or used that makes it dangerous. That could be a glass or a chair. It would be very difficult to define which dangerous weapon you had in mind." *Id.*

In 1993, the legislature made the weapons prohibition a general condition and amended its wording to the current iteration, prohibiting a probationer from possessing "weapons, firearms or dangerous animals." Or Laws 1993, ch 680, § 16. Although the 1993 discussion of "weapons" was not as robust as in 1981, it does show further concern over a potential use-based definition of weapons.

While the legislature was considering whether to amend the probation conditions, it was also considering Senate Bill (SB) 334 (1993), which amended ORS 166.370 (prohibiting certain weapons in public buildings) and ORS 166.280 (prohibiting possession of concealed weapons) to prohibit the "intentional" possession of "dangerous weapons" under the circumstances of those two statutes. Or Laws 1993, ch 625, §§ 1, 2, 4. In discussions on that bill, the legislature was made aware that almost anything could constitute a "dangerous weapon"; it was provided the examples of boiling water, a car, a rock, cowboy boots, and the sidewalk as instances when mundane objects became "dangerous weapons." Tape Recording, Senate Committee on Judiciary, SB 334, Feb 10, 1993, Tape 22, Side A (statement of Ross Shepard, representing the Oregon Criminal Defense Lawyers Association). To prevent someone from unwittingly committing a crime by bringing an object that could be considered a "dangerous weapon" to a public building, the legislature required that the person "intentionally" possess the instrument used as a "dangerous weapon." Tape Recording, Senate Committee on Judiciary, SB 334, Mar 1, 1993, Tape 35, Side B (conversation between Sen Jeannette Hamby and legislative counsel).

---

knuckles, billies, switchblade knives and gravity knives." Commentary § 3 at 4. A *deadly* weapon, on the other hand, was an instrument of combat that was designed to cause serious injury or death. The commentary thus suggests that when "weapon" is unmodified by either "deadly" or "dangerous" it is referring to an instrument designed for combat, but which might be designed to produce injury short of serious physical injury or death such as pepper spray or tear gas.

Against the backdrop of SB 334, some senators believed that the word "weapons" should be defined in the probation conditions statute. Senator Jeannette Hamby, the primary sponsor of SB 334, suggested that the term "weapons" in ORS 137.540(1)(j) could be defined using the definition of "dangerous weapon" contained in the United States Code. Referring to her work on SB 334, Senator Hamby noted that she had learned that objects that an average person may not consider a weapon—like a "unique kind of bat"—could constitute a dangerous weapon. Tape Recording, Senate Committee on Judiciary, SB 138, Feb 3, 1993, Tape 16, Side A. Vice Chair Robert Shoemaker agreed that "weapon" should be better defined but suggested that it should be tied to the Oregon Criminal Code. *Id*. He expressed concern that, if a weapon "could be anything you use, \* \* \* it would be awfully broad." *Id*. Dale Penn, representing the ODAA, agreed that the legislature could tie the definition of "weapons" to the Criminal Code, "which would detail knives and different types of things" that a probationer could not possess. *Id*.

Puzzlingly, despite both the prosecution and defense communities raising the problems with leaving the term "weapon" undefined, the legislature took no action in either 1981 or in 1993. Ultimately, the legislature decided to leave "weapon" undefined not once, but twice. That inaction is subject to multiple plausible interpretations. Certainly, on the one hand, we might conclude that the legislature knew of the problem and its inaction reflects an intended result.

On the other hand, nothing we have seen in our review of the legislative history, either in 1981 or 1993, suggests that anyone in the legislature actually wanted to create such ambiguity. Quite to the contrary, the legislative record is clear that the situation the 1981 legislature was reacting against was the growing concern that supervision conditions had become too vague, and that therefore probation officers had been acting in a nonuniform manner. Tape Recording, House Committee on Judiciary, HB 2317, Jan 26, 1981, Tape 22, Side A (statement of O.R. Chambers, Executive Assistant, Corrections Division). The purpose of the 1981 legislation was to address this concern and to

increase, not diminish, predictability in probation conditions. Given the purpose of the legislation, as one might expect, there is no instance in the legislative record of anyone—elected official or advocate—supporting the potentiality that probationers would be prohibited from possessing anything that could be used as a weapon—including a chair or a pot of boiling water, as were discussed on the record. These concerns were surely identified, but nothing indicates those outcomes were affirmatively desired by anyone.

   4.   Constitutional avoidance

        To sum up our review thus far, the text of "weapons" is ambiguous. Context is somewhat inconclusive, but perhaps slightly supports a design-based definition. And legislative history is inconclusive, but certainly shows that the legislature was aware of the risks of a use-based definition and took no corrective action. As we said in *Gaines*, "[i]f the legislature's intent remains unclear after examining [text, context and] legislative history, 'the court may resort to general maxims of statutory construction to aid in resolving the remaining uncertainty.'" 346 Or at 164-65. We conclude that is appropriate in this case.

        "It is a maxim of statutory construction that, when a statute is capable of more than one plausible interpretation, the court will avoid an interpretation that raises a constitutional problem." *Bonner v. Am. Golf Corp. of California, Inc.*, 372 Or 814, 844, 558 P3d 812 (2024); *see also State v. Stoneman*, 323 Or 536, 540 n 5, 920 P2d 535 (1996) ("[A] court will give a statute such an interpretation as will avoid constitutional invalidity."); *Salem College & Academy, Inc. v. Emp. Div.,* 298 Or 471, 481, 695 P2d 25 (1985) (holding same).

        We have previously held that the Oregon Constitution requires that "[t]he terms of a criminal statute must be sufficiently explicit to inform those who are subject to it of what conduct on their part will render them liable to its penalties." *State v. Graves*, 299 Or 189, 195, 700 P2d 244 (1985) (citing *State v. Hodges,* 254 Or 21, 27, 457 P2d 491 (1969)). We have further held that "[t]he equal privileges and immunities clause is also implicated when vague laws give unbridled discretion to judges and jurors to decide what

is prohibited in a given case, for this results in the unequal application of criminal laws." *Id*. That concern would apply equally to discretion given to probation officers.

In the past, we have considered whether a statute provided "fair warning" under a federal due process test. *State v. Illig-Renn*, 341 Or 228, 241, 142 P3d 62 (2006) ("In assessing a claim that a criminal statute fails to give fair warning, we employ the standard that federal courts have applied to criminal and quasi-criminal statutes—whether the statute would 'give the person of ordinary intelligence a reasonable opportunity to know what is prohibited so that he may act accordingly.'" (Quoting *Grayned v. City of Rockford,* 408 US 104, 108, 92 S Ct 2294, 33 L Ed 2d 222 (1972)).[11] The United States Supreme Court has emphasized that the conditions of supervision be sufficiently clear to provide notice of what behavior is prohibited. *See Griffin v. Wisconsin*, 483 US 868, 875 n 3, 107 S Ct 3164, 97 L Ed 2d 709 (1987) ("If the [probation] regulation in question established a standard of conduct to which the probationer had to conform on pain of penalty—*e.g.,* a restriction on his movements—the state court could not constitutionally adopt so unnatural an interpretation of the language that the regulation would fail to provide adequate notice.").

The "fair warning" principle has been reinforced in lower federal courts. For example, in *United States v. Evans*, 883 F3d 1154, 1164 (9th Cir 2018), the court stated, "A probationer must be put on clear notice of what conduct will (and will not) constitute a supervised release violation." *See also United States v. Simmons*, 343 F3d 72, 81 (2d Cir 2003) (holding that

---

[11] We have never foreclosed a state constitutional basis for a "fair warning" requirement. Article I, section 34 of the Oregon Constitution provides, in part:

"(2)   Upon conviction of a crime, an Oregon court or a probation or parole agency may order the convicted person to engage in education, counseling, treatment, community service or other alternatives to incarceration, as part of sentencing for the crime, in accordance with programs that have been in place historically or that may be developed in the future, to provide accountability, reformation, protection of society or rehabilitation."

Neither accountability nor reformation can be accomplished through behavioral prohibitions that fail to provide an individual fair notice of what is and is not prohibited conduct. Accordingly, at least in the context of probationary conditions, Article I, section 34, provides an independent and adequate state constitutional grounding for the "fair warning" principles otherwise contained in the due process requirement of the United States Constitution.

probation conditions must be "sufficiently clear to give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly."). It has also been replicated by state courts applying due process principles. *See, e.g.*, *In re Sheena K.*, 40 Cal 4th 875, 890, 153 P3d 282, 294 (2007) (explaining that a probation condition "must be sufficiently precise for the probationer to know what is required"); *State v. Allen*, 370 SC 88, 97, 634 SE2d 653, 657 (2006) ("'It is an essential component of due process that individuals be given fair warning of those acts which may lead to a loss of liberty. This is no less true whether the loss of liberty arises from a criminal conviction or the revocation of probation. *** [W]here the proscribed acts are not criminal, due process mandates that [a probationer or parolee] cannot be subjected to forfeiture of his liberty for those acts unless he is given prior fair warning.'" (Quoting *United States v. Dane*, 570 F2d 840, 843-44 (9th Cir 1977).).

In addition to providing notice to the individual being supervised, other jurisdictions have explained that supervision conditions must be sufficiently clear so as to prevent officers from impermissibly exercising their own discretion in interpreting the meaning of those conditions. *See, e.g.*, *Evans*, 883 F3d at 1164 ("[A] vague supervised release condition 'cannot be cured by allowing the probation officer an unfettered power of interpretation, as this would create one of the very problems against which the vagueness doctrine is meant to protect, *i.e.*, the delegation of basic policy matters to policemen for resolution on an ad hoc and subjective basis.'" (Quoting *United States v. Soltero*, 510 F3d 858, 867 n 10 (9th Cir 2007).); *see also State v. Wallmuller*, 194 Wash 2d 234, 240, 449 P3d 619, 621 (2019) (explaining that a condition barring an individual from frequenting "places where children congregate" was unconstitutionally vague under the federal and state constitutions without some clarifying language or an illustrative list of prohibited locations because ordinary people could not understand what conduct is proscribed and the condition was vulnerable to arbitrary enforcement).

Considering the need for fair notice, the state's proffered reading of "weapons" in ORS 137.540—particularly when considered within the context of constructive

possession—invites potential state and federal constitutional problems, independently under Article I, section 34, of the Oregon Constitution, and the state constitutional principles articulated in *Graves*, 299 Or 189, and separately under the Due Process Clause of the federal constitution. If the term "weapons" is defined by situational use, then virtually anything in the home can be a weapon when used in a particular manner. Defining a weapon in terms of how an object is used works well when evaluating *past* behavior, such as criminal statutes that apply to actions already undertaken. But probation conditions exist to regulate *future* behavior. A situational "use" definition applied to constructive possession makes it nearly impossible for probationers to predict what future behavior would, or would not, be prohibited. Further, it invites arbitrary enforcement that would vary between probation officers. For these reasons, we reject the state's definition of "weapons," in favor of a definition of "weapons" tied to the features of an object's design.

We note that other jurisdictions with supervision conditions concerning weapons utilize a design-based, not a use-based, definition. For instance, the federal sentencing guidelines, United States Sentencing Guideline § 5D1.3(c) (10) (2024), include as a standard condition for supervised release that the "defendant shall not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (*i.e.*, anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person, such as nunchakus or tasers)." Similarly, North Dakota defines the probation condition that a probationer not possess a "dangerous weapon" to prohibit possession of "any switchblade or gravity knife, machete, scimitar, stiletto, sword, or dagger; any billy, blackjack, sap, bludgeon, cudgel, metal knuckles, or sand club; any slingshot; any bow and arrow, crossbow, or spear; any weapon that will expel, or is readily capable of expelling, a projectile by the action of a spring, compressed air, or compressed gas including any such weapon, loaded or unloaded, commonly referred to as a BB gun, air rifle, or CO2 gun; and any projector of a bomb or any object containing or capable of producing and emitting any noxious liquid, gas, or substance." ND Cent Code Ann § 12.1-01-04.

We also emphasize that our holding here does not foreclose that the actual use of a tool as a weapon can constitute a probation violation. Using an object as a weapon to coerce, threaten, or menace someone else may constitute criminal activity. *See e.g*, ORS 163.275 (coercion); ORS 166.065 (harassment); ORS 163.190 (menacing). Further, even an *attempt*—intentionally taking "a substantial step toward[s]"—coercion, harassment, or menacing another with an object used as a weapon, can constitute criminal activity. *See e.g.*, ORS 161.405 ("A person is guilty of an attempt to commit a crime when the person intentionally engages in conduct which constitutes a substantial step toward commission of the crime."). Accordingly, actual use of an object as a weapon, even an object not designed for combat, can potentially constitute a probation violation under the "obey all laws" general probation condition. Here, the state did not allege that defendant's carrying of the knife in his backpack constituted any completed new criminal activity, nor an attempt to commit new criminal activity.

The sole question in this case is the legislative intent in using the term "weapons" in the general conditions of probation. Nothing in our decision today forecloses an individual court from constructing a special condition of probation for knives or other forms of potentially dangerous tools—such as, for example, a special condition prohibiting actual possession of any type of knife, regardless of design, outside the home, unless possessed for work purposes—as long as the record supports that such a condition is "reasonably related to the crime of conviction or the needs of the probationer for the protection of the public or reformation of the probationer, or both." ORS 137.540(2) (permitting imposition of special conditions in that circumstance); *Donovan*, 307 Or at 466 ("A condition of probation that 'does not promote public safety or rehabilitation is not permitted under the statute.'" (Quoting *Martin*, 282 Or at 588.)).

### III.   CONCLUSION

To summarize: Based on our analysis of the text, context, and legislative history, and relying on the maxim of constitutional avoidance, we conclude that the legislature intended for the term "weapons" in ORS 137.540 to apply

to instruments designed primarily for offensive or defensive combat or instruments that would reasonably be recognized as having substantially the same character, and not to tools or objects designed primarily for utility, even when those tools can be used as weapons under some circumstances. Applying that understanding of the term "weapon" in ORS 137.540(1)(j) to the facts of this case, we conclude that the trial court erred in finding that defendant had violated the general probation weapons condition. The trial court relied largely on the state's argument that all knives are, *per se*, weapons. As we have indicated, that argument is incorrect. Because the court did not conduct the proper inquiry, we reverse the trial court's judgments and remand for further proceedings in light of this decision.

The decision of the Court of Appeals is reversed. The judgments of the circuit court are reversed, and the case is remanded to the circuit court for further proceedings.

**BUSHONG, J.,** dissenting.

The majority opinion concludes that the knife that defendant's probation officer saw sticking out of his backpack was not a "weapon" for purposes of ORS 137.540(1)(j) unless it was "designed primarily for offensive or defensive combat[]" or "would reasonably be recognized as having substantially the same character." __ Or at __ (slip op at 2:1-7). The majority remands to the trial court to engage in a "factual inquiry" into that question. __ Or at __ (slip op at 2:12-14). I disagree with that disposition and with the test adopted by the majority opinion for determining whether a knife—or, for that matter, other implements that can be used as both tools and weapons—should be considered a weapon for purposes of the statute. In my view, the trial court and the Court of Appeals correctly concluded that defendant possessed a weapon in violation of one of the general conditions of probation specified in ORS 137.540(1)(j). Accordingly, I respectfully dissent.

Under ORS 137.540(1)(j), a probationer shall not "possess weapons, firearms or dangerous animals." The statute does not define "weapons," and, as the majority opinion points out, a knife can be used as a tool—a utensil that

is used to eat or cut food—and as a weapon. I would distinguish between the two, not by focusing on whether the implement was designed for combat or reasonably recognized as having the same character, as the majority opinion concludes, but by examining the circumstances surrounding a probationer's possession. Focusing on a probationer's possession of the implement in question follows from the text of ORS 137.540(1)(j). Additionally, the circumstances of that possession can support an inference that the probationer *possessed* the implement with the intent to *use* it as a weapon, rather than as a tool.

        The majority opinion acknowledges that a probationer using a knife to stab someone, to attempt to stab someone, or to coerce, threaten, or menace someone would be using the knife as a weapon, regardless of whether the knife had been specifically designed for combat. __ Or at __ (slip op at 38:3-13). If defendant had used the knife at issue in this case to stab or threaten to stab someone, then a court could properly conclude that it *was* a weapon. The fact that "weapon" has a use-based meaning, as the majority opinion acknowledges, helps us construe what it means to "possess weapons" as that term is used in ORS 137.540(1)(j) in a way that is similarly use-based. Although that may not be how the word "possess" is ordinarily understood, the context of this statute supports applying the term "possess weapons" based on facts showing how the knife was used or intended to be used. Thus, if the circumstances surrounding defendant's possession of the knife showed that he possessed it with the intent to use it to stab or threaten to stab someone, then a court could conclude that he was possessing it as a weapon. The circumstances here supported the trial court's finding that defendant possessed the knife in question as a weapon.

        Defendant possessed the knife in his backpack, with the handle sticking out, making it readily accessible to him by reaching back—without removing his backpack—and grabbing it. That suggests that he possessed the knife to use it as a weapon. The handle of the knife was wrapped in tape, making it easier for defendant to grab it quickly and hold it tightly, in a threatening way, if he thought he needed

a weapon. Defendant's manner of possessing the knife suggests that he possessed it as a weapon because he intended to use it, if necessary, as a weapon. That also is how defendant's probation officer saw it. After seeing the knife handle sticking out of defendant's backpack, the probation officer thought that defendant was in possession of a "weapon" in violation of the general condition of probation in ORS 137.540(1)(j). Based on the probation officer's testimony, the trial court determined as a factual matter that defendant had possessed a weapon in violation of that general condition of probation. Because there are sufficient facts in the record to support that determination, I would affirm.

That does not mean that *any* possession of this knife would necessarily be a violation of the general condition of probation in ORS 137.540(1)(j). For example, if defendant had possessed this knife in the bottom of his backpack, wrapped in a napkin with a fork and spoon alongside a cup and a plate, I would conclude as a factual matter that he possessed it as an eating utensil, not as a weapon. Similarly, a probationer who possessed a hammer in a toolbox alongside a wrench and a screwdriver on the way to his job at a construction site possessed the hammer as a tool, not as a weapon. A probationer who possessed a baseball bat in a duffel bag alongside a mitt, a baseball, cleats, and a baseball uniform on the way to a baseball field possessed the bat to play baseball, not to use it as a weapon. Under those circumstances, probation officers and courts should conclude that the probationer had not possessed a weapon in violation of the general condition of probation in ORS 137.540(1)(j).

But hammers and baseball bats, though not specifically designed for combat, can be used as weapons. The same is true of a knife that is not specifically designed for combat. The circumstances in which a probationer possessed such an implement can reveal that a probationer possessed it as a weapon. For example, a probationer holding a baseball bat or a hammer in his hand in a threatening manner as he walked towards a street brawl would be possessing the implement as a weapon. In my view, such a possession would violate the general condition of probation in ORS 137.540(1)(j), even if

the probationer stopped short of using the implement to bludgeon someone.

That common-sense approach is consistent with the legislative history. As the majority opinion recounts, legislators were pointedly advised, once in the 1981 session and again in the 1993 session, that the word "weapon," unmodified by words such as "deadly" or "dangerous," could be construed broadly and might present "line-drawing problems." __ Or at __ (slip op at 29:1 - 30:5, 30:6 - 32:2). On neither occasion did the legislature respond by changing the term. Thus, the legislature knew that "weapon" could be overinclusive and still seems to have preferred it to the alternatives. In resisting that conclusion, the majority reverts to the evidence that, as a general matter, the changes to the probation system were intended in part to make the system more predictable. __ Or at __ (slip op at 32:9 - 33:1). But the legislature certainly could have had that *general* purpose and yet chosen, in the *specific* context of weapons possession, to err on the side of overinclusiveness, trusting prosecutorial discretion and the sound judgment of trial courts to avoid revocations based on the benign possession of tools.

In a different context, we rejected a design-based approach in favor of a use-based approach to describe the nature of a weapon. In *State v. Delgado*, 298 Or 395, 692 P2d 610 (1984), we were asked to decide whether a switchblade knife was an "arm" within the meaning of Article I, section 27, of the Oregon Constitution.[12] The state contended that, because a switchblade was designed and most commonly used for offensive purposes and was not commonly used for personal defense, it was not an "arm" within the meaning of the Oregon Constitution. We were "unpersuaded" by the distinction urged by the state between offensive and defensive weapons. As we explained,

> "[a]ll hand-held weapons necessarily share both characteristics. A kitchen knife can as easily be raised in attack as in defense. The spring mechanism does not, instantly and irrevocably, convert the jackknife into an 'offensive' weapon. Similarly, the clasp feature of the common jackknife does

---

[12] Article I, section 27, of the Oregon Constitution provides, "The people shall have the right to bear arms for the defence [sic] of themselves, and the State, but the Military shall be kept in strict subordination to the civil power."

not mean that it is incapable of aggressive and violent purposes. *It is not the design of the knife but the use to which it is put that determines its 'offensive' or 'defensive' character.*"

298 Or at 399-400 (emphasis added).

Similarly, it is not the design of the knife in this case but whether the defendant possessed it to use it as a weapon that should determine whether the defendant violated the general condition of probation in ORS 137.540(1)(j). The circumstances of defendant's possession of the knife in question in this case, in my view, supported the trial court's finding that he possessed it to use it as a weapon, in violation of the general condition of probation in ORS 137.540(1)(j). The Court of Appeals agreed. I would affirm those decisions. Accordingly, I respectfully dissent.

Garrett, J., joins in this dissenting opinion.